NATURAL ARCH AND BRIDGE SOCI-
ETY, a Colorado non-profit corpora-
tion; Robert Moore; David Brandt–
Ericson; Harvey Leake; Evelyn John-
son; and Earl DeWaal, individuals,
Plaintiffs,

v.

Joseph F. ALSTON, Superintendent,
Rainbow Bridge National Monument;
Robert G. Stanton, Director of the Na-
tional Park Service; and the National
Park Service, Defendants.

Civil No. 2:00–C–0191J.

United States District Court,
D. Utah,
Central Division.

April 5, 2002.

Hal J. Pos, Parsons Behle & Latimer, Salt Lake City, UT, William David Thode,

William Perry Pendley, Mountain State Legal Foundation, Lakewood, CO, for plaintiffs.

Carlie Christensen, U.S. Attorney's Office, Salt Lake City, UT, James J. DuBois, U.S. Dept. of Justice, Denver, CO, for defendants.

## MEMORANDUM OPINION & ORDER (CORRECTED TEXT)

JENKINS, Senior District Judge.

### I. *Introduction*

On March 3, 2000, the plaintiffs filed a complaint asking this court to declare that portions of the National Park Service's 1993 General Management Plan ("1993 GMP") violates the Establishment Clause of the First Amendment and the Equal Protection Clause of the Fifth Amendment to the United States Constitution. The plaintiffs also sought injunctive relief to prevent the defendants from enforcing the allegedly unconstitutional portions of the 1993 GMP. On February 14, 2001, the defendants filed a motion to dismiss and on February 15, 2001, the plaintiffs filed a motion for summary judgment.[1] On April 30, 2001, the court heard oral argument on the parties' motions. William Davis Thode from Mountain States Legal Defense Fund appeared on behalf of the plaintiffs and Carlie Christensen, James J. Dubois, and Kevin Jones appeared on behalf of the defendants. Having reviewed and considered the motion, memoranda and exhibits submitted by the parties, and having heard and considered counsel's arguments con-

---

1. This court's jurisdiction to review the 1993 GMP falls under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (2000). *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir.1994). However, because this case involved analysis of issues outside the scope of the administrative record, this court, upon joint motion, (Joint Motion to Consoli- date Briefing, filed March 1, 2001 (dkt. no. 28)), entered an order consolidating the parties briefing. (Order Granting Joint Motion to Consolidate Briefing, filed March 2, 2001 (dkt. no. 29).) Thus, each dispositive motion filed by the parties was treated as such and also treated as an opening brief for purposes of the Administrative Procedure Act.

cerning the same, the court hereby rules as follows:

## II. *Background*

### A. *Rainbow Bridge National Monument*

Rainbow Bridge is a unique natural resource of national and international significance. (R. at 0087.) Located in the rugged canyon country of Southern Utah, it is the world's largest natural bridge, spanning 275 feet, arching to a height of 290 feet, and is 42 feet thick at the top and 33 feet wide at the narrowest point. (R. at 0006.) Made up of Kayenta sandstone and Navajo sandstone, stream erosion caused the bridge's formation by cutting through a tight meander in an upper layer of Navajo sandstone. (R. at 0087–88.) Because of the unique interplay between stream erosion and Navajo sandstone, bridges are less common than arches in Rainbow Bridge's surrounding environment. (R. at 0087.) Its remote location, together with the rugged environment of the area, left the bridge unpublicized until it was reached by the Douglass–Cummings Party on August 14, 1909.[2] (R. at 0011.)

Although not officially publicized until 1909, the significance of Rainbow Bridge to Native Americans can be traced back for over a century. (R. at 0033.) A variety of Native American tribes, such as Navajo, Hopi, San Juan Paiute, and others, view Rainbow Bridge and other nearby features and sites as important to their spiritual beliefs and identity as a people. (R. at 2064.) In 1909, for example, it was noted that the Navajo guide, Dogeye-be-gay, rode around the end of the bridge because he did not know the prayer to insure his safe return should he pass beneath it. (R. at 0033.) Similar observations were noted by other parties who utilized Navajo guides to reach the bridge. To many Navajos, Rainbow Bridge is a sacred place.[3] (*Id.*) As such, they believe that it should be respected by all humans. (*Id.*)

To Navajos, the form of the rainbow is a symbol of protection and danger past. (R. at 0033–34.) Rainbow Bridge appears to be associated with the Navajo sun deity and his rainbow path across the sky and with the Hero Twins, one of whom was fathered by the sun. (R. at 0034.) One historian explains:

> The Navajo have a tradition that long, long ago one of their hero gods, hunting in the canyon, was suddenly entrapped by a rush of flood waters. In this predicament, with escape cut off, death for the hunter seemed certain. But just then the great Sky Father cast a rainbow before the torrent, the hero god climbed to safety across the arch, and the latter was turned to stone and has so remained until this very day.

(*Id.*) (quoting Judd Neil, *The Discovery of Rainbow Bridge*, National Parks Bulletin, Vol. 9, No. 54, November 1927). Known in the Navajo tongue as Tsi–Na–Ne–Ah (meaning arch rock or rock bridge), Navajos consider Rainbow Bridge to be the most significant of natural bridges in the area due to its relationship and western proximity to Navajo Mountain. (R. at

---

2. Two parties, one directed by a government surveyor, W.W. Douglass, and the other directed by University of Utah Dean Byron Cummings, set out to discover the bridge that Native Americans said could be found near Navajo Mountain. (R. at 0011.) The parties, however, eventually met and joined forces. (*Id.*) Interestingly, two Paiutes, Jim Mike and Nasja Begay, guided the parties to the bridge. (*Id.*)

3. Since the Navajo culture considers itself to be living with nature, all things that nature has made are considered sacred. (R. at 0169.) For Native Americans, Rainbow Bridge should be kept in as much of a natural setting as possible. (*Id.*)

0169.) Traditional Navajo ceremonies and rites are private and passed on from generation to generation. (*Id.*)

Other Native American tribes, including San Juan Paiute, Hopi, and Pueblo, were also said to have accorded special significance to Rainbow Bridge. One Hopi migration legend, while not specifically mentioning Rainbow Bridge, places certain clan ancestors near Navajo Mountain. (*Id.*) The legend tells of a rainbow which swung around until its end touched Navajo Mountain where the Snake Clan people were dropped. (*Id.*) In prehistoric times, Pueblo Indians constructed a primitive structure at the base of Rainbow Bridge which some say may have served as an altar. (*Id.*) It was a main object of interest until it passed out of existence in the early 1930s. (*Id.*)

After its formal discovery in 1909, the bridge's uniqueness was recognized by President William H. Taft who on May 30, 1910, issued Presidential Proclamation Number 1043, setting aside a 160 acre tract of land under the authority granted him by section 2 of the 1906 Act for the Preservation of American Antiquities, 16 U.S.C. § 431 (2000), for scientific and historical purposes. (R. at 0087.) President Taft's Proclamation read, in part,

> WHEREAS, an extraordinary natural bridge, having an arch which is in form and appearance much like a rainbow, and which ... is of great scientific interest as an example of eccentric stream erosion, and it appears that the public interest would be promoted by reserving this bridge as a National Monument, together with as much land as may be needed for its protection;
>
> Now therefore, I ... do hereby set aside as the Rainbow Bridge National Monument, one surveyed tract of land, embracing said natural bridge, containing one hundred and sixty acres of land
> . . . .

(*Id.*) After 1910, the federal protection of Rainbow Bridge continued to evolve.

In 1916, Congress established the National Park System by enacting the National Park Service Organic Act, 16 U.S.C. § 1 *et seq.* (2000). The Organic Act established the National Park Service as the managing agency for national monuments, such as Rainbow Bridge. 16 U.S.C. § 1 (2000). Section 1 states that

> The service thus established shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified ... by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

*Id.* Thus, visitors to the bridge are subject to the regulation of the National Park Service.

In 1958, pursuant to the Colorado River Storage Project, 43 U.S.C. § 620 (1994), Congress approved the construction of the Glen Canyon Dam, which is fifty-eight miles below Rainbow Bridge National Monument. *Badoni v. Higginson*, 638 F.2d 172, 175 (10th Cir.1980). Upon its completion in 1963, the dam formed the Glen Canyon Reservoir, also known as Lake Powell. *Id.* The federal lands adjacent to Lake Powell, other than the monument, comprise the Glen Canyon National Recreational Area, 16 U.S.C. § 460dd (2000), and are administered by the National Park Service. *Id.* §§ 1, 460dd-3. A small portion of Lake Powell extends to the monument boundary in its northwest corner, thus forming a common boundary between Rainbow Bridge National Monu-

ment and Glen Canyon National Recreation Area. (R. at 0006.) Pursuant to 43 U.S.C. § 620 (1994), the Secretary of the Interior is required to "take adequate protective measures to preclude impairment of the Rainbow Bridge National Monument." *Id.*

Prior to the creation of Lake Powell, Rainbow Bridge, which is surrounded by the Navajo Reservation, was relatively isolated. (R. at 0006.) Its remoteness, coupled with the rugged environment,[4] kept visitation numbers quite low. (R. at 32.) The lake provided boat access to the monument, increasing visitor use. In 1955, about 1,000 people visited Rainbow Bridge. (R. at 0038, 2063.) In 1974, only four years after Lake Powell had entered the 160–acre tract of the monument, *Badoni*, 638 F.2d at 175, 55,104 visitors came to Rainbow Bridge National Monument. (R. at 0014.) By 1986, approximately 65,000 visited the bridge just in the month of July—an average of 270 people at any one time over an eight-hour day. (R. at 0390.) In 1995, visitation peaked at approximately 346,000 visitors. (R. at 2878.) It was anticipated that if the increase in visitation continued, by 2000, visitation would approach 450,000. (R. at 0390.)

The adjacent Glen Canyon National Recreation Area is extremely popular, and its visitors often access the national monument. (R. at 0016.) The management needs and visitor-use patterns of the two areas are necessarily different due to the different policies and philosophies applica-

ble to a national monument versus a national recreation area. (*Id.*) For instance, as previously noted, concerning Rainbow Bridge National Monument, the National Park Service is charged with "conserv[ing] the scenery and the natural and historic objects and the wild life ... and ... provid[ing] for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1 (2000). In contrast, concerning Glen Canyon National Recreation Area, the National Park Service is directed to "provide for public outdoor recreation use and enjoyment of Lake Powell and lands adjacent thereto in the States of Arizona and Utah ...." 16 U.S.C. § 460dd (2000). The administration of both the recreation area and the monument, with somewhat conflicting purposes, proved to be difficult. As early as the mid–1970s, the National Park Service recognized the need for public education and interpretation of the similarities and differences between the recreation area and the monument. (R. at 0015, 0029–68.) The Park Service's longterm goal was to define the desired character of the visitor experience within the monument with particular attention paid to differentiating between orienting visitor use to water-based recreation and sightseeing and orienting visitor use to inspire a sense of respect and awe for the national monument and protect against visitor impacts.[5] (R. at 0089–90.)

---

4. A fifty-two mile dirt road across part of the reservation to the base of Navajo Mountain brought potential visitors to the lodge furnishing guide services. (R. at 0037.) From there, visitors continued on foot or horse for a two-day round trip to the bridge. (*Id.*) Later, a river trip, via powerboat up the Colorado River from Lees Ferry to the mouth of Forbidding Canyon, required three days and a twelve mile-hike to the monument. (R. at 2063.)

5. The first General Management Plan stated that "[a]n important goal of the monument's interpretation, as well as its overall management, is to convey to the visitors the message that the monument is a special place, apart from the rest of Lake Powell, and that it was set aside, not for recreation, but to preserve a natural wonder." (R. at 0092.)

By the late 1980s, as a result of the changes in visitation to the monument, including convenient access by more recreation-oriented visitors, the monument suffered adverse impacts. For instance, the large number of visitors on the few accessible acres of the monument resulted in erosion and loss of soil, trampling of vegetation, multiple trailing, rock graffiti, and litter. (R. at 0090, 0139–40, 0209, 0221, 0243, 2066; *see also* R. at 2731–34 (Park Service incident reports of vandalism at Rainbow Bridge).) Crowding and noise became an issue, which disturbed the tranquil setting of the monument. (R. at 0043–44, 0090, 0154, 0156.) Cultural sites, such as petroglyphs and archeological sites, were being damaged by visitors touching, climbing, and defacing petroglyphs with graffiti. (R. at 0139, 0345.) The number and manner of operation of boats raised safety and pollution issues. (R. at 0153, 0338.) Unlimited visitor access desecrated the sanctity of the bridge to surrounding Native American tribes and lessened its overall cultural importance. (R. at 0090.)

Recognizing the need for public education and interpretation and the need to reduce visitor impact to the monument, in 1985, after eleven years of planning, (R. at 0029–68), the National Park Service issued a Statement for Management for the monument. The Park Service's main objectives were to (1) "preserve Rainbow Bridge by such means as will leave this outstanding natural resource unimpaired for the enjoyment of present and future generations"; (2) "identify, determine the significance of, and protect the cultural resources within the national monument"; (3) "promote public understanding and appreciation of Rainbow Bridge and the park's other natural resources in a setting as free as possible from the influence of human activities"; (4) "determine and interpret the cultural significance of Rainbow Bridge";[6] (5) "cooperate with the Bureau of Reclamation to insure that management of the Lake Powell impoundment is compatible to the greatest degree possible with the long-term preservation of Rainbow Bridge"; and (6) "strive to foster and maintain a better cooperative relationship for the use and protection of the national monument with the Navajo Tribe." (R. at 0018.)

In September 1990, the National Park Service distributed the Draft General Management Plan, Development Concept Plan, Resource Management Plan, Interpretive Prospectus and Environmental Assessment for the monument ("DGMP/EA"). (R. at 0069, 2036.) The

---

**6.** The 1974 Interpretive Prospectus first noted that

> [f]rom the analysis of potential interpretive values existing at the national monument, it becomes evident that the impressive feature extends beyond its physical dimensions into the realm of historic and cultural appreciation. Rainbow Bridge, although a natural feature, has symbolic value much like such places as Mount Rushmore, the Statue of Liberty, or the Lincoln Memorial.
>
> Interpretation seeks to identify these particular values, both congenial and provocative, as well as to demonstrate their role in a living tradition concept. This concept simply invites visitors to assume a receptive state of awareness, much as one might in any meeting hall, cathedral, or temple of the mind. It encourages respect for cultural beliefs and strengthens the identity and heritage of the Navajo Indian.
>
> It suggests that an honest appraisal of the historic example set by Dogeye-begay and other Indian guides, may offer a new awareness and appreciation for both natural and cultural values, irregardless of the life style from which they may originate. Because of their beliefs, these men rode around the end of the bridge abutment rather than go beneath or through the span. Visitors should be aware of this behavior as part of the overall interpretation of the site.

(R. at 0050.)

DGMP/EA presented a proposal and three alternatives for addressing the objectives outlined in the 1985 Statement for Management and mitigating the impacts on the environment. (R. at 0071, 2036.) During the ninety-day review period, the Park Service received a total of 86 comments. (R. at 2036.)

As a result of substantive public comment,[7] the National Park Service chose to reassess the range of feasible alternatives presented and reissue the DGMP/EA. (R. at 2036.) The Park Service released this reassessment for a 60–day public review period on December 15, 1991, ending February 15, 1992. (*Id.*) Representatives of the Park Service met with a variety of interested groups, including the Navajo Tribe. (*Id.*) This time, the Park Service received a total of 95 comments. (*Id.*)

The Park Service's efforts to educate and reduce visitor damage to the monument finally culminated in the 1993 final General Management Plan ("1993 GMP"). Published in June 1993, the 1993 GMP "addresses the issues of diverse public expectations, visitor experience, protection of natural and cultural resources, access, interpretive services, and facilities." (R. at 2019.) For instance, to protect and enhance visitor experience, to promote a passive and awe-inspiring tone, and to reduce damage to Rainbow Bridge as a result of visitor mischief, the 1993 GMP proposes a carrying capacity at the monument that fluctuates during high and low season. (R. at 2026–27, 2050–56.) In addition, in order to mitigate damage to soil and vegetation, the 1993 GMP contemplates a program for rehabilitating access trails, restoring prior damage, and eliminating multiple trails. (R. at 2030–31.) This program includes maintaining cement trails from the boat dock to two main viewing areas, discouraging use of the dirt trail from the second

viewing area to Rainbow Bridge, reestablishing native species, and closing specific areas for revegetation. (*Id.*)

The 1993 GMP also acknowledges the important cultural resources of the monument, (R. at 2025), and how to educate the public concerning the customs and beliefs, as they relate to Rainbow Bridge, of other cultures. For instance, both the 1993 GMP and the accompanying Interpretive Prospectus contemplate educating the public that some neighboring Native American cultures view Rainbow Bridge as a sacred site. (R. at 2027, 2059–60, 2064–65.) Although neither the 1993 GMP nor the Interpretive Prospectus prohibits visitors from approaching or walking underneath Rainbow Bridge, both contemplate discouraging "visitor access to the base of the bridge itself and to the area directly below the bridge ... [out of] respect for the sacred nature of this area to American Indian groups." (R. at 2027.) A wayside sign and brochure expresses the spiritual significance to the Native Americans and the Park Service's request that the public respect cultural differences by voluntarily not walking underneath Rainbow Bridge. (R. at 2072 73.) Two of the many goals of the Interpretive Prospectus are to "help visitors understand that different cultures perceive resources differently, i.e., some neighboring American Indians regard Rainbow Bridge as sacred," and "generate visitor interest in the cultures and lifestyles, from prehistoric to present times, of the people of the Rainbow Bridge region." (R. at 2068.)

**B. *The Commencement of this Action***

On March 3, 2000, plaintiffs filed a complaint challenging the 1993 GMP as it relates to the Park Service's policy to request that the public respect cultural dif-

7. Many of the public comments requested that visitation to the monument should in some fashion be reduced or controlled. (R. at 2039.)

ferences by voluntarily not walking underneath Rainbow Bridge. (Complaint, filed March 3, 2000 (dkt. no. 1).) In their complaint, plaintiffs alleged that the relevant portions of the 1993 GMP violated the Establishment Clause of the First Amendment, (*id.* at 10–12), and the Equal Protection Clause of the Fifth Amendment to the United States Constitution. (*Id.* at 12.) Plaintiffs sought declaratory and injunctive relief. (*Id.* at 13–15.)

In February 2001, both parties filed dispositive motions. This court's jurisdiction to review the 1993 GMP and Interpretive Prospectus in light of plaintiffs' claim is governed by the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (2000). However, in the Attorneys' Planning Meeting Report, the parties identified substantive issues outside of the scope of the administrative record on which discovery was necessary. (Attorneys' Planning Meeting Report, filed June 27, 2000 (dkt. no. 7).) Therefore, upon joint motion, this court ordered the parties to consolidate their briefing. On February 14, 2001, defendants filed a motion to dismiss plaintiffs' complaint for lack of standing and for failure to state a claim on plaintiffs' Establishment Clause and Equal Protection causes of action.[8] On February 15, 2001, plaintiffs filed a motion for summary judgment seeking declaratory and injunctive relief on plaintiffs' substantive claims. Both plaintiffs and defendants timely filed their appropriate response and reply memorandums. Therefore, the court will address each party's motion below.

### III. *Discussion*

#### A. *Defendants' Motion to Dismiss*

*Standing*

██ In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d

351 (1992), the United States Supreme Court articulated the Article III standing requirements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560–61, 112 S.Ct. 2130 (internal quotations and citations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements and of coming forward with evidence of specific facts which prove standing." *Bear Lodge Multiple Use Assoc. v. Babbitt*, 175 F.3d 814, 821 (10th Cir.1999) (citing *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130).

██ Defendants contend that the individually named plaintiffs lack standing because they have failed to establish the requisite of injury-in-fact. "Establishing injury in fact requires 'a factual showing of perceptible harm.'" *Id.* (quoting *Lujan*, 504 U.S. at 566, 112 S.Ct. 2130 (quotation omitted)). " '[T]o satisfy Article III's case or controversy requirement, a litigant in federal court is required to establish its own injury in fact.'" *Id.* (quoting *National Council for Improved Health v. Shalala*, 122 F.3d 878, 882 (10th Cir.1997)). "Although a given action may cause harm to third persons, 'a litigant may invoke only its own constitutional rights and may not

---

8. Judicial review of administrative decisions under the APA are processed as appeals and governed by the Federal Rules of Appellate

Procedure. *Olenhouse,* 42 F.3d at 1580. Fed. R.App. P. 27 specifically allows a party to file a motion to dismiss.

assert rights of others not before the court.'" *Id.* (quoting *National Council*, 122 F.3d at 882). The court will address each plaintiff to determine whether they have met their burden of establishing an injury-in-fact.

### Individual Plaintiffs

### Robert Moore, David Brandt–Ericson, and Harvey Leake

■ . The complaint identifies plaintiffs Moore, Brandt–Ericson, and Leake as follows:

6. Plaintiff Robert Moore is a member of [National Arch and Bridge Society ("NABS")] and also serves as the President of NABS.

7. Plaintiff David Brandt–Ericson is a member of NABS and also serves as the Secretary of NABS.

8. Plaintiff Harvey Leake is a member of NABS and is the author of a book about Rainbow Bridge.

(Complaint, filed March 3, 2000 (dkt. no. 1), at 3–4.) Plaintiffs fail to further identify a particularized injury suffered by plaintiffs Moore, Brandt–Ericson, and Leake. Although plaintiffs Moore, Brandt–Ericson, and Leake argue that they regularly visit Rainbow Bridge and therefore have standing to challenge the 1993 GMP, without an allegation or a proffer of evidence in the record supporting a "personal injury suffered by [these plaintiffs] *as a consequence* of the alleged constitutional violation," *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 485, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the court must conclude that plaintiffs Moore, Brandt–Ericson, and Leake lack standing. Therefore, this court grants defendants' motion to dismiss for lack of standing as to plaintiffs Moore, Brandt–Ericson, and Leake.

### Evelyn Johnson

Ms. Johnson is a member of NABS and on its board of directors. In October 1997, a group of people, including Ms. Johnson, hiked through the Navajo Reservation to the backside of Rainbow Bridge. Approximately thirty minutes after Ms. Johnson and her group reached Rainbow Bridge, a ranger approached them and stated that they "were in an area [they] weren't supposed to be in and [they] were supposed to be down with the other people that were coming from the marina." (Deposition of Evelyn Johnson, at 29:3–6.) The ranger did not demand that Ms. Johnson and her group leave the area; instead, he "asked very nicely," (*id.* at 38:25), in the form of a "request." (*Id.* at 42:12.) The ranger did not threaten Ms. Johnson nor a member of her group with citation if they chose not to leave the area. (*Id.* at 31:17–18.) The ranger did not specifically state why he was asking Ms. Johnson and her group to leave the area. (*Id.* at 29:2–7.) From the deposition excerpts submitted with the parties' motions, it is unclear whether Ms. Johnson or members of her group were sitting in an area closed for revegetation. Ms. Johnson either did not notice or read signs notifying the public that certain areas around the bridge were closed due to revegetation efforts, (*id.* at 28:11–22; 31:6–13), nor signs requesting or mandating that people not walk underneath the bridge. (*Id.* at 31:11–13.)

Although it is clear that Ms. Johnson and her group voluntarily chose to comply with the ranger's request and leave the area, it is unclear whether the ranger's request stems from the Park Service's policy of asking that people voluntarily comply with not walking underneath the bridge or the Park Service's revegetation efforts. Ms. Johnson did not allege in her complaint nor state in her deposition testimony that the ranger requested her depar-

ture from the bridge because of the Park Service's voluntary policy. Although Ms. Johnson may feel that this conclusion is a logical inference, there are no facts in the record supporting Ms. Johnson's logic. Ms. Johnson has failed to bear her burden to establish the "irreducible constitutional minimum of standing" that she has "suffered an 'injury in fact' ... which is ... concrete and particularized." *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130; *see also United States v. Hays,* 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (refusing "to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power"). Without more, Ms. Johnson clearly lacks standing to challenge the 1993 GMP as implemented by the Interpretive Prospectus. Therefore, this court grants defendants' motion to dismiss plaintiff Evelyn Johnson.

### *Earl DeWaal*

In the complaint, Mr. DeWaal relies on the following alleged incident at Rainbow Bridge in July 1999 to establish standing to challenge the 1993 GMP and Interpretive Prospectus:

> On July 18, 1999, Earl DeWaal and members of his family and friends traveled to Rainbow Bridge. While taking in the view from the official viewing area, Mr. DeWaal asked a Park Service Ranger if anyone was allowed to walk underneath the Monument. The Ranger initially told Mr. DeWaal that no one could approach the monument. However, when DeWaal asked for a reason, the Ranger capitulated and told him that he (Mr. DeWaal) could use the official trail to Rainbow Bridge, but threatened to cite or arrest him if he stepped off of the trail.
>
> Immediately thereafter, Senior Ranger Mike Dedman arrived. Mr. DeWaal informed Ranger Dedman that preventing visitors from approaching Rainbow

Bridge was unlawful.... Ranger Dedman ... told Mr.DeWaal that no one could use the trail. When asked for a reason why, Ranger Dedman responded that use of the trail was prohibited for reasons of protecting Native Americans religion—specifically, in order to prevent desecration of the site. Ranger Dedman confirmed that if Mr. DeWaal attempted to approach Rainbow Bridge he would be cited or arrested. Although he wanted to use the trail to walk underneath Rainbow Bridge, Mr. DeWaal was compelled not to for fear of being cited or arrested.

(Complaint, filed March 3, 2000 (dkt. no. 1), at 9–10.)

Although somewhat contradictory, Mr. DeWaal's deposition testimony supports the complaint's characterization that both rangers *prohibited* Mr. DeWaal from approaching and/or walking underneath the bridge. After arriving at the monument by boat, Mr. DeWaal walked to the bridge's viewing area and asked one ranger "if I could go up to the bridge." (Deposition of Earl DeWaal, at 26:2–3.) According to Mr. DeWaal the ranger responded with an outright "no," (*id.* at 26:5), then followed up by stating that "he didn't want me to go underneath there, that there were groups of Indians that they would allow to go up there but I was not allowed up there." (*Id.* at 26:11–14.) Later, Mr. DeWaal spoke with another ranger about approaching the bridge. According to Mr. DeWaal, the ranger responded: "He said, 'Well if you go up there,' he said, 'That is fine, but if you step off the trail, I will either cite you or arrest you.'" (*Id.* at 30:3–5; *see also id.* at 34:1–3 ("He told me that if I went up there to the bridge ... that I would be cited or arrested.").)

Based on this July 1999 incident between Mr. DeWaal and the two park rangers, Mr. DeWaal asserts that he has been

directly affected by the 1993 GMP, as implemented by the Interpretive Prospectus, and therefore has standing to challenge the plan.

■ While it may be that Mr. DeWaal has alleged a concrete injury, his injury (allegedly being prohibited from approaching Rainbow Bridge) falls outside of the 1993 GMP's interpretative plan of requesting voluntary compliance with not approaching or walking underneath Rainbow Bridge. On their face, the 1993 GMP and is accompanying Interpretive Prospectus do not prohibit the general public from approaching or walking underneath Rainbow Bridge; they only seek voluntary forbearance out of respect for different cultures. As the United States Supreme Court stated in *Lujan,*

> there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. [And], it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. Mr. DeWaal's alleged injury is not fairly traceable to the Park Service's voluntary compliance policy, but is the result of "the independent action of some third party [the rangers] not before the court." *Id.* at 560, 112 S.Ct. 2130. The July 1999 incident does not give Mr. DeWaal standing to challenge the 1993 GMP and Interpretive Prospectus under the APA. Mr. DeWaal's injury is redressable, if at all, in the form of a *Bivens* action against the individual rangers who allegedly prohibited him from approaching Rainbow Bridge. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

If Mr. DeWaal's standing was predicated only on the July 1999 incident, this court would be compelled to grant defendants' motion to dismiss plaintiff Earl DeWaal for lack of standing. However, another alleged incident that took place in the summer of 1998 satisfies Article III's requirement that Mr. DeWaal suffer an injury-in-fact resulting from the challenged action. *See Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. In July or August of 1998, Mr. DeWaal visited Rainbow Bridge with his family. (Deposition of Earl DeWaal, at 39:3–4.) While there, he spoke with a ranger about approaching and walking underneath Rainbow Bridge. Mr. DeWaal recalled that the ranger "*asked* us not to go underneath the bridge." (*Id.* at 39:18–19.) When asked for a reason, the ranger responded that "it had to do with ... the Indian religion." (*Id.* at 39:20–22; *see also id.* at 40:1–4 ("My recollection is that I remember her talking about the Indians. I remember vaguely that she asked us not to.").)

■ Based on this incident, Mr. DeWaal has alleged an injury-in-fact that is fairly traceable to the 1993 GMP and accompanying Interpretive Prospectus. *But see Bear Lodge,* 175 F.3d at 820–21 (holding that plaintiffs lack standing to challenge Park Service's policy of asking public to voluntarily refrain from climbing Devils Tower during month of June when American Indians engage in certain ceremonies "because they remain free to climb Devils Tower any time they choose.... Indeed, while many climbers have chosen not to climb during the month of June out of respect for American Indian use of the site, appellants ... have continued to climb in June"). Unlike his July 1999 visit, Mr. DeWaal was not prohibited from approaching Rainbow Bridge, but was asked by a park ranger—without the threat of citation or arrest—not to do so

out of respect for Native American beliefs. In addition, unlike Evelyn Johnson's incident, Mr. DeWaal's injury stems from the Park Service's request for voluntary compliance in not approaching or walking underneath Rainbow Bridge. This action by the park ranger clearly falls within the scope of the 1993 GMP and accompanying Interpretive Prospectus. At this stage, therefore, Mr. DeWaal has standing to challenge the 1993 GMP and Interpretive Prospectus under the APA and this court must deny defendants' motion to dismiss plaintiff Earl DeWaal for lack of standing.

### Natural Arch and Bridge Society

■ In *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the United States Supreme Court articulated the following three-part test for association standing:

[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343–44, 97 S.Ct. 2434. Here, plaintiffs have failed to establish—as is their burden—that the association's members "would otherwise have standing to sue in their own right." *Id.* As discussed above, this court dismissed plaintiffs Moore, Brandt–Ericson, Leake, and Johnson from the complaint for lack of standing. Although this court retained jurisdiction over plaintiff DeWaal, his status in the case does not change the court's conclusion that NABS lacks standing. That is because Mr. DeWaal was not a member of NABS when either his summer of 1998 or July of 1999 incidents occurred. (Deposition of Earl DeWaal, at 6:9–24.) It was not until after

his July 1999 incident that Mr. DeWaal joined as a member of NABS. (*Id.*) As such, his alleged injury cannot be imputed to the association for purposes of standing. Although some members of NABS may visit Rainbow Bridge as plaintiffs' argue in the response to defendants' motion to dismiss, that is not enough to establish a member's injury-in-fact. The United States Supreme Court has "repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power." *Hays*, 515 U.S. at 742, 115 S.Ct. 2431. A generalized injury is all that NABS can plead in regard to the 1993 GMP and Interpretive Prospectus. Consequently, NABS does not have standing to challenge its propriety. Therefore, this court grants defendants' motion to dismiss plaintiff Natural Arch and Bridge Society for lack of standing.

### Equal Protection

In the complaint, Mr. DeWaal alleges that

The Park Service, through its policies and practices, now manages Rainbow Bridge in such a way as to create a class based on race and / or nationality, which class (Native Americans) is not subject to the general policy of the Park Service that prohibits visitors from approaching or walking under Rainbow Bridge. The Park Service has created two different standards for the use of federal land around Rainbow Bridge, allowing for the exclusive use of portions of federal land by a group of people distinguishable only by their race and / or nationality.

(Complaint, filed March 3, 2000 (dkt. no. 1), at 13.) Defendants argue that plaintiff's equal protection cause of action fails to state a claim for which relief can be granted.

This court agrees.

■ Plaintiff DeWaal alleges that the 1993 GMP and Interpretive Prospectus violates his equal protection guarantees because Native Americans are "not subject to the general policy of the Park Service that prohibits visitors from approaching or walking under Rainbow Bridge." (*Id.*) However, as the record submitted to the court clearly indicates, the 1993 GMP and Interpretive Prospectus do not "prohibit[ ] visitors from approaching or walking under Rainbow Bridge." (*Id.*) Instead, the 1993 GMP and Interpretive Prospectus request that visitors consider viewing Rainbow Bridge from the viewing area rather than walking up to or under the bridge. This invitation is in the form of a request, not a demand or prohibition. Native Americans are not singled out; in fact, under the 1993 GMP and Interpretive Prospectus, any visitor, including Native Americans, can walk to or under the bridge and *all* visitors are requested to forbear, without distinction. Therefore, as Native Americans are not treated any differently than other visitors to the monument under the 1993 GMP and Interpretive Prospectus, this court grants defendants' motion to dismiss plaintiff DeWaal's equal protection cause of action for failure to state a claim upon which relief can be granted.

### B. *Plaintiff DeWaal's Motion for Summary Judgment/Opening Brief*

This court previously found that Mr. DeWaal's July 1999 incident did not confer standing for him to challenge the 1993 GMP and Interpretive Prospectus under the APA; instead, that incident may provide Mr. DeWaal with a *Bivens* action against the individual rangers who allegedly prohibited him from approaching Rainbow Bridge. However, this court also found that based on Mr. DeWaal's allegations concerning the summer 1998 incident, Mr. DeWaal does have standing to challenge the 1993 GMP and Interpretive Prospectus under the APA. Therefore, this court will separately address Mr. DeWaal's motion for summary judgment as it relates to his *Bivens* claim involving the individual rangers and also treat his motion as an opening brief to challenge the 1993 GMP and Interpretive Prospectus under the APA.

### *Motion for Summary Judgment*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the United States Supreme Court held that victims of a violation of the United States Constitution by a federal officer have a right to recover damages against the officer in federal court despite the absence of any statute conferring such a right. *Id.* The holding of the *Bivens* case has been extended to include causes of action based on the First Amendment. *See Paton v. La Prade,* 524 F.2d 862 (3d Cir.1975); *White v. Boyle,* 538 F.2d 1077 (4th Cir.1976); *Collier v. Estelle,* 506 F.2d 22 (5th Cir.1975); *Yiamouyiannis v. Chemical Abstracts Serv.,* 521 F.2d 1392 (6th Cir.1975); *Hostrop v. Board of Junior Coll. Dist.,* 471 F.2d 488 (7th Cir.1972). However, in order to bring a *Bivens* action against a federal officer, the plaintiff must comply with the Federal Rules of Civil Procedure and name and properly serve the individual defendant. *See* Fed. R.Civ.P. 4, 10.

■ Having reviewed Mr. DeWaal's motion for summary judgment and the exhibits submitted by the parties, this

court has concluded that at this stage, Mr. DeWaal's motion should be denied. As noted above, Mr. DeWaal's claim is in the form of a *Bivens* action against the individual rangers who allegedly prohibited Mr. DeWaal from approaching and/or walking underneath Rainbow Bridge. However, in his complaint, Mr. DeWaal failed to name, and later failed to properly serve the individual rangers. This court does not yet have personal jurisdiction over the rangers, and may grant no relief against them. As Mr. DeWaal has not shown that he is entitled to a judgment as a matter of law, this court therefore denies his motion for summary judgment.[9]

*Opening Brief*

 Judicial review of agency action is governed by section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (2000). Section 706 requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* § 706. "These standards require the reviewing court to engage in a 'substantial inquiry.' ... An agency's decision is entitled to a presumption of regularity, 'but that presumption is not to shield [the

9. Although this court denies Mr. DeWaal's motion for summary judgment based on his failure to name and properly serve the individual rangers, this court would also be compelled to deny Mr. DeWaal's motion as there is a genuine issue of material fact concerning Mr. DeWaal's version of the events as they unfolded in July 1999. *See Deposition of Paul Nelson,* at 67–78 ("[Mr. DeWaal] said can I walk up to the bridge. . . . I said you can walk up to the bridge. And he wanted to know why he couldn't go anywhere he wanted to go. And I explained to him that there was a reveg area, and I pointed out the signs right behind him. He was standing right in front of a sign. And I said but there is an open trail and you can use that trail. And he says so are you going to arrest me if I walk up the trail. I said no, I'm not going to arrest you if you walk up the trail. I said you can walk up the trail, but you can't go into the reveg area. . . . [Mr. DeWaal] was yelling. He was literally yelling."); *Incident Report,* filed by Ranger Paul Nelson concerning incident with Mr. DeWaal ("This individual immediately interrupted my conversation in a loud and boisterous manner by claiming that all of the signs are lies and that 'treehuggers' from the Sierra Club are responsible for the park service's way of managing Rainbow Bridge. He suggested that he could go anywhere he wanted in the area and that everything regarding the spirituality of the site is an outright lie. . . . I asked this individual to respect other peoples enjoyment of the site, and with that he got louder still and challenged me to prevent him from encroaching into the reveg area. He asked me if there was a trail and I

replied to the affirmative. . . . [H]e stated that I wanted to arrest him and suggested that I would not show him the trail. Before I could respond he told me his attorney is preparing to sue the [Park Service] and demanded my name. He again suggested that I would not show him the trail, and that I just wanted to cite him."); *Deposition of Mike Dedman,* at 132–52 ("Well [Mr. DeWaal] didn't direct anything to me initially. He literally yelled to everyone around him that there was a conspiracy between the Sierra Club, the park service, and Indians. And he said that three different times. . . . [Mr. DeWaal] kept wondering why you couldn't walk anywhere in the trail. He said the trail was closed. I said, no, there is a trail. I said, you can walk up there. I kept insisting. And then I do remember him responding about the park service closing off areas to the public in support of Indians. And he did use the word 'Injuns' at one point which I think I felt somewhat offended by."); Letter from visitor at Rainbow Bridge to National Park Service (August 1, 1999) ("During a recent visit to Lake Powell ... one of the visitors began to verbally attack the ranger. . . . He was demanding his 'right to do whatever he wanted to without the intrusion of a special interest group,' however, he was very verbally abusive to the ranger. The visitor cursed and ranted for several minutes. . . . After I and several other visitors asked him to please leave, he did leave. The ranger never asked him to go; he continued to help the man understand.").

**1222**

agency's] action from a thorough, probing, in-depth review.' " *Olenhouse*, 42 F.3d at 1574 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). Nevertheless, a court's review under this standard is "narrow and deferential," the court being required to uphold the agency's action if it has "articulated a rational basis for the decision and has considered relevant factors." *Mountain Side Mobile Estates P'ship v. Secretary of Hous. and Urban Dev.*, 56 F.3d 1243, 1250 (10th Cir.1995). "However, these limitations do not apply to questions of law. 'The [f]ailure to apply the correct legal standard or to provide ... a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal.' " *Id.* (quoting *Nielson v. Sullivan*, 992 F.2d 1118, 1119–20 (10th Cir.1993)).

In this case, plaintiff Earl DeWaal contends that the Park Service's 1993 GMP and Interpretive Prospectus violates (1) the Establishment Clause of the First Amendment and (2) the Equal Protection Clause of the Fifth Amendment to the United States Constitution. As this court granted defendants' motion to dismiss plaintiff DeWaal's equal protection cause of action for failure to state a claim under Fed. R. Civ. Pro. 12(b)(6), this court will only address plaintiff's Establishment Clause claim.

The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion ...." U.S. Const. Amend. I. In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the United States Supreme Court established a three-part test for lower courts to use when determining whether governmental action has the effect of establishing religion. According to the *Lemon* test, governmental action does not offend the Establishment Clause if it (1) has a secular purpose, (2) does not have the principal or primary effect of advancing or inhibiting religion, and (3) does not foster an excessive entanglement with religion. *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105.

In *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), Justice O'Connor's concurring opinion sought "to refine the *Lemon* analysis to focus more on whether the government is 'endorsing' religion." *Bauchman v. West High Sch.*, 132 F.3d 542, 551 (10th Cir.1997) (citing *Lynch*, 465 U.S. at 687–94, 104 S.Ct. 1355). "Applying Justice O'Connor's refined analysis, the government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that 'religion or a particular religious belief is favored or preferred.' " *Id.* (quoting *County of Allegheny v. ACLU*, 492 U.S. 573, 592–93, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)). Although Justice O'Connor's concurring opinion in *Lynch* appears to be the predominate test when evaluating Establishment Clause claims, *see id.* at 552, the Tenth Circuit applies "both the purpose and the effect components of the refined endorsement test, together with the entanglement criterion imposed by *Lemon* ...." *Id.*

The test established by the Tenth Circuit in *Bauchman*, however, does not end this court's analysis. The government's ability to accommodate religious beliefs is an important consideration when determining whether the government's action has "either ... the purpose or ... the effect of conveying a message that 'religion or a particular religious belief is favored or preferred.' " *Id.* (quoting *County of Allegheny*, 492 U.S. at 592–93, 109 S.Ct. 3086). The United States Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause."

*Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 144–45, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) (holding that Florida's award of unemployment compensation benefits to claimant, who was discharged when she refused to work on her Sabbath, would not violate Establishment Clause (citing *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Walz v. Tax Comm'n*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970))).[10] Therefore,

> [r]ather than mechanically invalidating all governmental conduct or statutes that confer benefits or give special recognition to religion in general or to one faith ... the Court has scrutinized challenged legislation or official conduct to determine whether, in reality, it establishes a religion or religious faith, or tends to do so.

*Lynch*, 465 U.S. at 678, 104 S.Ct. 1355. The issue presented in this case is whether the 1993 GMP, as implemented by the Interpretive Prospectus, is an appropriate accommodation, or whether it violates the Establishment Clause.

### Purpose

"Recent cases suggest the purpose component of the endorsement test should evaluate whether the government's 'actual' purpose is to endorse or disapprove of religion (i.e., did the government intend to endorse or disapprove of religion)." *Bauchman*, 132 F.3d at 551. Because "the

Constitution does not require that the purpose of every governmental sanctioned activity be unrelated to religion," Mr. De-Waal must show that the 1993 GMP and Interpretive Prospectus have "no 'clearly secular purpose'" or that "in spite of the existence of a legitimate secular purpose(s), the defendants' 'actual' purpose is to endorse or disapprove of religion." *Id.* at 554 (citations omitted).

The "'purpose' requirement aims at preventing the relevant government decisionmaker"—in this case, the National Park Service—"from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." *Church of Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos*, 483 U.S. 327, 335, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). Had the Park Service demanded that visitors view Rainbow Bridge from the viewing area rather than walking up to or under the bridge, or prohibited visitor access to the bridge, then it could possibly be said that the Park Service had abandoned neutrality and intentionally promoted Native American religious beliefs over those of other cultures. Here, however, the 1993 GMP and Interpretive Prospectus contemplate the public's voluntary compliance with the policy. Its purpose is not to establish, promote, or advance religion; its purpose is to educate and inform the public about different cultures and increase sensitivity to the beliefs

10. In *Lynch,* Chief Justice Burger commented on the accommodation principle

> No significant segment of our society and no institution within it can exist in a vacuum or in total or absolute isolation from all the other parts, much less the government. 'It has never been thought either possible or desirable to enforce a regime of total separation....' *Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 760, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). Nor does the Constitution require complete separation of church and state; it

affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility towards any. *See e.g., Zorach v. Clauson,* 343 U.S. 306, 314, 315, 72 S.Ct. 679, 96 L.Ed. 954 (1952); *McCollum v. Board of Education,* 333 U.S. 203, 211, 68 S.Ct. 461, 92 L.Ed. 649 (1948). Anything less would require the 'callous indifference' we have said was never intended by the Establishment Clause. *Zorach, supra,* 343 U.S. at 314, 72 S.Ct. 679.

*Lynch,* 465 U.S. at 673, 104 S.Ct. 1355.

**1224**

of others. In the words of the policy, its purpose is to "help visitors understand that different cultures perceive resources differently, i.e., some neighboring American Indians regard Rainbow Bridge as sacred," and "generate visitor interest in the cultures and lifestyles, from prehistoric to present times, of the people of the Rainbow Bridge region." (R. at 2068.) This court believes that promoting an understanding of neighboring cultures is an appropriate secular purpose which allows the general public the opportunity to enhance their individual and collective perspective. The purpose is primarily informational. In addition, the policy serves a dual secular purpose of fostering the preservation of the historical, social, and cultural practices of Native Americans. "Courts have long recognized the historical, social and cultural significance of religion in our lives and in the world, generally. Courts have also recognized that 'a variety of motives and purposes are implicated' by government activity in a pluralistic society." *Bauchman,* 132 F.3d at 554 (quoting *Lynch,* 465 U.S. at 680, 104 S.Ct. 1355).

***Effect***

 "The effect component ... should evaluate whether a 'reasonable observer,' aware of the history and context of the community in which the conduct occurs, would view the practice as communicating a message of government endorsement or disapproval." *Id.* at 551–52 (citing *Capital Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 763, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995)). The United States Supreme Court clearly " 'contemplate[s] that on occasion some advancement of religion will result from governmental action.' " *Id.* at 555 (quoting *Lynch,* 465 U.S. at 683, 104 S.Ct. 1355). "The Court has made it abundantly clear ... that 'not every law that confers an "indirect," or "remote," or "incidental" benefit upon [religion] is, for that same reason alone, constitutionally invalid.' " *Lynch,* 465 U.S. at

683, 104 S.Ct. 1355 (quoting *Nyquist,* 413 U.S. at 771, 93 S.Ct. 2955). However, "[f]or a law to have forbidden 'effects' ... it must be fair to say that the *government itself*" in the eyes of a reasonable observer, "has advanced religion through its own activities and influence." *Amos,* 483 U.S. at 336, 107 S.Ct. 2862. "This is an objective inquiry, not an inquiry into whether particular individuals might be offended by the content of the [1993 GMP and Interpretive Prospectus] or consider [such policies] to endorse religion." *Bauchman,* 132 F.3d at 555. This court believes that a reasonable observer aware of the history and context of the community, would not view the 1993 GMP and Interpretive Prospectus as communicating a message of government endorsement or disapproval. Like its purpose, the effect of the Park Service's policy is informational. Visitors are made aware of the beliefs of others, but are not told that those beliefs are to be preferred over any others, or that the Park Service has adopted traditional religion as its own.

Again, the court notes that the 1993 GMP and Interpretive Prospectus contemplates the public's voluntary compliance with not approaching or walking under Rainbow Bridge. Plaintiff argues, however, that the "voluntary" request is voluntary in name only and its actual effect is to coerce plaintiff "to support or participate in religion or its exercise." *Lee v. Weisman,* 505 U.S. 577, 587, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). Specifically, plaintiff asserts that the 1993 GMP and Interpretive Prospectus, because of the social pressure of complying with the policy, "coerce visitors into conforming to a specific Native American religious practice: that of '*not* passing under the Rainbow God.' " (Reply in Support of Plaintiff's Opening Brief, filed April 12, 2001 (dkt. no. 39), at 17.)

Plaintiff's arguments, by themselves, do not transform the Park Service's voluntary request into a tactic to coerce plaintiff into supporting or participating in Native American religion or its exercise. The policy only asks visitors to consider not walking to or under Rainbow Bridge; it does not, as plaintiff suggests, coerce visitors into practicing the Native American religion associated with the belief about not walking under the Rainbow God. In fact, visitors to Rainbow Bridge have virtually *no* opportunity to observe, let alone participate in the practice of traditional Native American relgions.

Although some visitors may feel social pressure not to walk to or under the bridge, that in no way transforms the voluntary request into a mandatory policy. In fact, there is no officially imposed consequence for choosing to walk to or under the bridge. *See Kerr v. Farrey,* 95 F.3d 472 (7th Cir.1996) (holding that prisoner's "voluntary" alcohol abuse rehabilitation program involving attendance at pseudo-religious meetings violated coercion test of Establishment Clause because prisoner's choice not to attend meetings resulted in higher security risk classification or in negative marks on his prison record); *Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (striking voluntary prayer program at football games because, among other reasons, attendance was mandatory for many students such as players, band members, and cheerleaders with officially imposed consequences if these students failed to attend). Plaintiff has failed to show how the voluntary policy is in effect a mandatory policy coercing visitors to support or adopt Native American religion or participate in its exercise.

### Excessive Entanglement

To determine whether a given policy constitutes an excessive entanglement the court must look at "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." *Lemon,* 403 U.S. at 615, 91 S.Ct. 2105. While making this determination, this court is mindful that "[e]ntanglement is a question of kind and degree." *Lynch,* 465 U.S. at 668, 104 S.Ct. 1355.

Here, the institutions that are benefitted by the 1993 GMP and Interpretive Prospectus are certain Native American tribes. Although Native American tribes are religious in nature, they are also social and cultural institutions, which tends to negate plaintiff's suggestion that because Native American tribes are "primarily religious," the 1993 GMP and Interpretive Prospectus necessarily entangles church and state.

In addition, as plaintiff's opening brief establishes, the 1993 GMP and Interpretive Prospectus implements many policies such as distribution of new signs, website information, and brochures indicating the sanctity of Rainbow Bridge to Native Americans, the Park Service's revegetation efforts, construction of new trails and observation area, and an increased ranger presence at the monument. However, the 1993 GMP and Interpretive Prospectus also contemplate possible modifications to the interpretive plan in case carrying capacity increases over the years. These policies include ranger presence on tour boats, restricting dock access, and a more intensive interpreter program. However, the only policies in force that can likely be tied to the Park Service's request that the public consider not walking to or underneath the bridge are the distribution of new signs, website information, and brochures and perhaps the increased ranger presence. These activities, by themselves, do not indicate that the Park Service is excessively entangled with religion because

of the nature of the aid the Park Service provides. On the other hand, these activities do indicate the very limited nature of the Park Service's involvement in this case. The Park Service is not at all involved in Native American religious practices at Rainbow Bridge—it does not pray or hold ceremonies or interact with said religious practices or tribal members engaging in them. The Park Service only provides a setting more conducive to Native American worship.

Finally, although the Park Service consulted with Native American tribes concerning the social, cultural, and religious importance of Rainbow Bridge, it is incumbent upon the park to do so to fulfill its important trust responsibilities to American Indians. For instance, in 1978, Congress enacted the American Indian Religious Freedom Act creating a government-wide policy

> to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship

through ceremonials and traditional rites.[11]

42 U.S.C. § 1996 (1994). Here, the resulting relationship between the Park Service and certain Native American tribes is not of the type which violates the excessive entanglement prong of the *Lemon* test. *See Widmar v. Vincent,* 454 U.S. 263, 272, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (suggesting that entanglement problems occur when government involves itself in invasive monitoring of religion); *see also Board of Educ. of the Westside Cmty Sch. v. Mergens,* 496 U.S. 226, 253, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (holding that Equal Access Act does not excessively entangle church and state because Act's "custodial oversight of the student-initiated religious group, merely to ensure order and good behavior, does not impermissibly entangle government in the day-to-day surveillance or administration of religious activities").

Based on the foregoing,

**IT IS ORDERED** that the defendants' motion to dismiss is GRANTED as to plaintiffs Moore, Brandt–Ericson, Leake, Johnson, and Natural Arch and Bridge Society for lack of standing, and DENIED as to plaintiff DeWaal; defendants' motion

---

**11.** Since the 1930s, Congress has passed other federal statutes protecting tribal governments and cultures. *See* Native American Graves and Repatriation Act, 25 U.S.C. §§ 3001–3013 (2000) (requiring federal land managers, including National Park Service, to protect Native American graves, consult with tribes concerning religious and cultural sites and objects, and to repatriate cultural and religious items found on federal lands); National Historical Preservation Act Amendments of 1992, 16 U.S.C. § 470a(d)(6)(A)-(B) (2000) ("Properties of traditional religious and cultural importance to an Indian. tribe or Native Hawaiian organization may be determined to be eligible for inclusion on the National Register."). In addition, in a 1996 Executive Order, the federal government "acknowledge[d] that site-specific worship is vital to Indian religious practices." *Bear*

*Lodge,* 175 F.3d at 817. Interestingly, in the early 1990s, the National Park Service requested that the Utah State Historic Preservation Officer ("USHPO") make a determination of eligibility of Rainbow Bridge for the National Register of Historic Places as a site that has cultural significance based on its traditional and sacred values to Native Americans. (R. at 2036.) On March 17, 1992, the USHPO concurred with the recommendation that Rainbow Bridge is eligible for listing. (*Id.*) In the Executive Order, *federal agencies are required to:* "(1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid aversely affecting the physical integrity of such sacred sites." *Id.* (citing Exec. Order No. 13,007, 61 Fed.Reg. 26,771 (1996)).

to dismiss for failure to state a claim is GRANTED as to plaintiff DeWaal's equal protection claim;

IT IS FURTHER ORDERED that plaintiff DeWaal's motion for summary judgment is DENIED as to his challenge to the 1993 GMP and Interpretive Prospectus under the Administrative Procedure Act and his claim is dismissed on the merits; plaintiff DeWaal's motion for summary judgment is DENIED as to his claim involving alleged violation of the First Amendment by employees of the National Park Service for failure to join the proper parties as defendants.

Let Judgment be entered accordingly.