**BEAR LODGE MULTIPLE USE ASSOCIATION, et al., Plaintiffs,**

v.

**Bruce BABBITT, Secretary of the Interior, et al., Defendants.**

**No. 96–CV–063–D.**

United States District Court, D. Wyoming.

April 2, 1998.

William Perry Pendley, Todd S. Welch, Mountain States Legal Foundation, Denver, CO, for Plaintiffs.

Nicholas Vassallo, Carol A. Statkus, U.S. Attorney's Office, Cheyenne, WY, Sandra B. Zellmer, Dept. of Justice, Washington, DC, for Defendants.

John C. Schumacher, Steven C. Emery, Steven J. Gunn, Law Office of John Schumacher, Fort Washakie, WY, for Cheyenne River Sioux Tribe, Burdell Blue Arm, Arvol Looking Horse, Romanus Bear Stops, Steven Vance, Intervenor Defendants.

Andrew W. Baldwin, Baldwin & Crocker, Lander, WY, Jack F. Trope, Cranford, NJ, for Medicine Wheel Coalition on Sacred Sites of North America, Northern Cheyenne Tribe, Amicus.

John R. St. Clair, Fort Washakie, WY, Walter R. Echo–Hawk, Steven C. Moore, Brett Lee Shelton, Native American Rights Fund, Boulder, CO, for National Congress of American Indians, Amicus.

Kevin J. Hasson, Eric W. Treene, Roman Storzer, The Becket Fund for Religious Liberty, Washington, DC, for Becket Fund for Religious Liberty, Amicus.

### ORDER

DOWNES, District Judge.

The above-captioned matter comes before the Court on Plaintiffs' appeal of Defendants' Final Climbing Management Plan for Devil's Tower National Monument. The Court, having carefully considered the briefs and materials submitted in support of the motion and Defendants' opposition thereto, having heard oral argument from the parties and being otherwise fully advised in the premises, FINDS and ORDERS as follows:

### BACKGROUND

The United States Department of the Interior, National Park Service ("NPS") issued A Final Climbing Management Plan ("FCMP") / Finding of No Significant Impact for Devils Tower National Monument [1] in February of 1995. The FCMP "sets a new direction for

---

1. The Devils Tower National Monument is located in northeast Wyoming. The FCMP reports that the Tower is a "sacred site" to several American Indian peoples of the northern plains who are increasingly traveling to the monument to perform "traditional cultural activities." Devils Tower is also eligible for inclusion to the national Register of Historic Places as a traditional cultural property. The FCMP further reports:

   Recreational climbing at Devils Tower has increased dramatically from 312 climbers in 1973 to over 6,000 annually. New route development in the last ten years resulted [in] accelerated route development and bolt placement. Today the tower has about 220 named routes. Approximately 600 metal bolts are currently embedded in the rock along with several hundred metal pitons. Devils Tower is world famous for its crack climbing, which depends primarily on removable protection placed by climbers in cracks.

   Activities performed by the numerous climbers on the tower during the spring through fall climbing season have affected nesting raptors, soil, vegetation, the integrity of the rock, the area's natural quiet, and the rock's physical appearance. Some American Indians have complained that the presence of climbers on the sacred butte and the placement of bolts in the rock has adversely impacted their traditional activities and seriously impaired the spiritual quality of the site.

   (FCMP at ii-iii.)

managing climbing activity at the tower for the next three to five years", its stated purpose being, "to protect the natural and cultural resources of Devils Tower and to provide for visitor enjoyment and appreciation of this unique feature." (FCMP at i.) To protect against any new physical impacts to the tower, the FCMP provides that no new bolts or fixed pitons will be permitted on the tower, and new face routes requiring new bolt installation will not be permitted. *Id.* at 24–25. The FCMP does allow individuals to replace already existing bolts and fixed pitons. *Id.* at 25. In addition, the plan calls for access trails to be rehabilitated and maintained, and requires camouflaged climbing equipment, and climbing routes to be closed seasonally to protect raptor nests. *Id.* at 24–29. The FCMP further provides that "[i]n respect for the reverence many American Indians hold for Devils Tower as a *sacred* site, rock climbers will be asked to *voluntarily* refrain from climbing on Devils Tower during the culturally significant month of June." *Id.* at i (emphasis added). The FCMP does not identify any other reason for the June "voluntary closure." [2]

The NPS represents that it will not enforce the voluntary closure, but will instead rely on climbers' self-regulation and a new "cross-cultural educational program" "to motivate climbers and other park visitors to comply." *Id.* at 22. The NPS has also placed a sign at the base of the Tower in order to encourage visitors to stay on the trail surrounding the Tower. Despite the FCMP's reliance on self-regulation, it also provides that if the voluntary closure proves

to be "unsuccessful," the NPS will consider taking several actions including: (a) revising the climbing management plan; (b) reconvening a climbing management plan work group; (c) instituting additional measures to further encourage compliance; (d) change the duration and nature of the voluntary closure; (e) *converting the June closure to mandatory;* and (f) writing a new definition of success for the voluntary closure. *Id.* at 23 (emphasis added). Factors indicating an unsuccessful voluntary closure include, little to no decrease in the number of climbers, an increase in the number of unregistered climbers and increased conflict between user groups in the park. *Id.* The NPS, however, states that the voluntary closure will be "fully successful" only "when every climber personally chooses not to climb at Devils Tower during June out of respect for American Indian cultural values." *Id.*

The NPS plans to fully comply with its own June closure by not allowing NPS staff to climb on the tower in June except to enforce laws and regulations or to perform emergency operations. Originally the plan also contained a provision stating that commercial use licenses for June climbing guide activities would not be issued by the NPS for the month of June. *Id.* at 22. Plaintiffs filed a Motion for Preliminary Injunction seeking to enjoin Defendants from the commercial climbing ban during the month of June. This Court granted that motion in June of 1996. In December of the that year, Defendant issued a decision revoking the commercial climbing ban.

The Plaintiffs [3] challenge several practices

---

**2.** The Defendants attempt to characterize these measures as relating solely to American Indian culture and being wholly separate from any religious practices. The Court is not persuaded that a legitimate distinction can be drawn in this case between the "religious" and "cultural" practices of those American Indians who consider Devils Tower a sacred site.

**3.** Plaintiff Bear Lodge Multiple Use Association ("BLMUA") is a voluntary, nonprofit corporation based in Hulett, Wyoming (near Devils Tower National Monument) whose goal is to develop management objectives for natural resources that maintain economic stability, public access and environmental sustainability and/or health, in and around local communities. (Compl.¶ 1.) Plaintiff Andy Petefish, a member of BLMUA, is a resident of Wyoming, and is doing business as

Tower Guides, a commercial guiding service that provides professional guides to assist persons in climbing Devils Tower. *Id.* ¶ 2. Plaintiff Gary Anderson, a member of BLMUA, is a citizen of Wyoming and has been climbing on Devils Tower for 12 years, including the month of June for each of those 12 years. *Id.* ¶ 3. Plaintiff Kenneth D. Allen, a member of BLMUA, is a resident of Hulett, Wyoming, and has been climbing on Devils Tower for more than 4 years, including the month of June for each of those 4 years. *Id.* ¶ 4. Plaintiff Gregory Hauber, a member of BLMUA, is a resident of Hulett, Wyoming, and has been climbing on Devils Tower for over a year, including the month of June. *Id.* ¶ 5. Plaintiff Wes Bush, a member of BLMUA, is a resident of Hulett, Wyoming, and has been climbing on Devils Tower for almost 2 years, including the month of June. *Id.* ¶ 6.

adopted in the FCMP. While the FCMP no longer calls for a ban on commercial climbing in the month June, Plaintiffs argue that the Defendant wrongfully contends that it has the power to impose such a rule. Other provisions objected to by the Plaintiffs remain a part of the plan. These include the "voluntary" ban on climbing in June; an interpretive education program which explains the religious and cultural significance that the Monument has among some Native Americans; and finally, the placement of signs which encourage people to remain on the trail surrounding the Tower.

### STANDARD OF REVIEW

Judicial review of agency action is governed by § 706 of the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701–706. The Plaintiffs in this case implicate the subsections of § 706 which require a reviewing court to hold unlawful and set aside agency action, findings, and conclusions found to be: arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[4] "These standards require the reviewing court to engage in a 'substantial inquiry.' ... An agency's decision is entitled to a presumption of regularity, 'but that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review.' " *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir.1994) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)).

Nevertheless, a court's review of an agency decision under this standard is "narrow and deferential," the court being required to uphold the agency's action if it has "articulated a rational basis for the decision and has considered relevant factors." *Mountain*

---

4. 5 U.S.C. § 706 provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
    (B) contrary to constitutional right, power, privilege, or immunity;

*Side Mobile Estates Partnership v. Secretary of Housing and Urban Dev.*, 56 F.3d 1243, 1250 (10th Cir.1995). "However, these limitations do not apply to questions of law. 'The [f]ailure to apply the correct legal standard or to provide ... a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal.' " *Id.* (quoting *Nielson v. Sullivan*, 992 F.2d 1118, 1119–20 (10th Cir.1993)).

In this case Plaintiffs contend that the NPS has stepped outside of the bounds imposed by law in two important ways. First they allege that the NPS's plan wrongfully promotes religion in violation of the establishment clause of the first amendment. Secondly, they argue that the NPS's own policies prohibit the types of actions adopted in the FCMP.

### *Commercial Climbing Ban*

■ The Defendants assert that any challenge to the ban on commercial climbing at the Monument has now been mooted. In November of 1996 the NPS found that "at the current time there is no necessity to restrict commercial guided climbing ...." (Administrative Record (A.R.) at 3066). As a result they did away with the mandatory commercial climbing ban that they had initially approved as part of the FCMP. Defendants now argue that this addendum to the FCMP moots Plaintiffs' challenge of the commercial ban. In the recent case of *Phelps v. Hamilton*, the Tenth Circuit provided a succinct description of the mootness doctrine. 122 F.3d 1309 (10th Cir.1997). In that opinion it stated:

The constitutional mootness doctrine is grounded in Article III's requirement that

---

    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
    (D) without observance of procedure required by law;
    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

federal courts decide actual, ongoing cases or controversies. If an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the appeal must be dismissed. The central question in determining whether a case has become moot is whether the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.

*Id.* at 1325 (internal quotation marks and citations omitted). In order to maintain jurisdiction over this particular issue "it is not enough that a dispute was very much alive when suit was filed," the controversy must be continuing and ongoing. *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990); *Fischbach v. New Mexico Activities Assoc.*, 38 F.3d 1159, 1160 (10th Cir.1994).

The question in this case is whether the Department of Interior's decision to amend the management plan by eliminating limitations on commercial climbing transforms this controversy into one of only historical significance.[5] Plaintiffs argue that the NPS's repeated representations that they have the power to ban commercial climbing in the manner originally proposed renders this a live controversy requiring court action. They go on to argue that the NPS's position necessitates a permanent injunction prohibiting the government Defendants from banning commercial climbing for any given period. (Plaintiff's Amended Complaint at 19.)

While the Court could permanently enjoin the NPS from instituting any commercial climbing ban, such an order would constitute relief to a hypothetical and non-existent injury. Consequently, any permanent injunction at this stage would be futile. Whatever the Government's motives, the ban against commercial climbing is no longer a live controversy. For this Court to treat it as such would serve only an advisory purpose. Therefore the commercial climbing ban issue is moot and will not be addressed by this Court. However, it is important to note that any subsequent effort to resuscitate this ill-conceived ban would only serve to impair the Defendants' credibility with this Court.

### Standing

■ Defendants contest the Plaintiffs' standing to challenge the FCMP's provision providing for a cultural interpretive program and the NPS's decision to place signs at the base of the Tower. Plaintiffs allege that the interpretive program adopted by the NPS promotes the religion of American Indians in violation of the establishment clause of the First Amendment. In particular, the Plaintiffs allege that the program proselytizes school children who visit the Monument under the guise of educating children about the heritage surrounding the Memorial. Defendants counter this by arguing that the Plaintiffs have failed to sufficiently allege that they have been injured by the program.

The United States Supreme Court summarized the standing requirements in the seminal case of *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In *Lujan*, plaintiffs, several environmental organizations dedicated to wildlife conservation and other environmental causes, sought to challenge the Secretary of the Interior's reinterpretation of section 7(a)(2) of the SEA, 16 U.S.C. § 1536. In analyzing plaintiffs' standing, the Supreme Court summarized its recent holdings and outlined the three essential elements necessary to establish standing:

[o]ver the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized, (citations omitted) and (b) 'actual or imminent,' not 'conjectural' or 'hypothetical,' (citations omitted). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." (Citations omitted).

---

5. In conducting this analysis this Court assumes that the withdrawal of the commercial climbing ban was not simply a contrivance to avoid the likelihood of a permanent injunction which was signaled by this Court's Order Granting Plaintiffs' request for preliminary injunctive relief.

Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." (Citations omitted).

*Id.* 504 U.S. at 560. Noting that the party invoking federal jurisdiction bears the burden of establishing these elements and of coming forward with evidence of specific facts which prove standing, the Supreme Court concluded that plaintiffs had failed to establish an "injury in fact," as well as redressability. *Id.* at 561, 567–68.

Establishing injury in fact requires "a factual showing of perceptible harm." *Id.* at 566 (quoting *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973)). Key to the analysis of injury in fact is the nature of the injury suffered by the Plaintiffs themselves. "To satisfy Article III's case or controversy requirement, a litigant in federal court is required to establish its *own* injury in fact." *National Council for Improved Health v. Shalala,* 122 F.3d 878, 882 (10th Cir.1997) (emphasis added). While a given action may cause severe and immediate harm to third persons, "a litigant may invoke only its own constitutional rights and may not assert rights of others not before the court." *Id.* The affidavits and materials submitted by Plaintiffs to establish standing in regard to the interpretive program fail to meet this threshold.

The only injury alleged by Plaintiffs relating to the interpretive program, is that children are being indoctrinated in the religious beliefs of Native Americans. The affidavits submitted to this Court establish that children from Hulett Public School take outings to the Monument which include exposure to the interpretive program at issue. They do not, however, establish that any of the parties are parents of these children or that any of the parents of these children are members of BLMUA. Although the Plaintiffs may feel that this ultimate conclusion is a logical inference there are no facts in the record supporting such a leap in logic. The Supreme Court has "repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power." *United States v. Hays,* 515 U.S. 737, 115 S.Ct. 2431, 2435, 132 L.Ed.2d

635 (1995). A generalized injury is all that Plaintiffs have established in regard to the interpretive program. Consequently, they have no standing to challenge its propriety.

Very similar arguments surround the Plaintiffs' challenge of the NPS's decision to place signs which ask visitors to the to stay on the trail surrounding the Tower. Plaintiffs assert that the sign coerces individuals into supporting and participating in Native American religions by not allowing them to approach the Tower. Defendants note that the Plaintiffs have failed to allege that they themselves have actually been hindered from approaching the Tower as a result of the sign. Plaintiffs respond by contending that BLMUA members who are parents of children have been injured because their children have been coerced into staying on the trail. The affidavits submitted in support of that contention once again fail to establish standing. Plaintiffs have submitted the affidavits of Loretta Preuss, Linda Tokarczyk, and Debra Bush to substantiate this claim. While each individual states that they have been injured because their children have been coerced into complying with Native American religious beliefs, they have not alleged that they are members of BLMUA. For this Court to assume that the injury complained of somehow relates to the parties in this case would be to blindly step beyond the record before it. Because the record does not establish that the NPS's decision to place signs has injured these Plaintiffs, they have no standing.

*Voluntary Climbing Ban*

■ The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion ...." (U.S. Const.amend. I) The Courts of this country have long struggled with the type and extent of limitations on government action which these ten words impose. At its most fundamental level, the United States Supreme Court has concluded that this provision prohibits laws "which aid one religion, aid all religions, or prefer one religion over another." *Everson v. Board of Ed. of Ewing,* 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947). Defining this prohibition on a case by case basis has proven a difficult

endeavor, but the Court has developed a number of useful frameworks for conducting the analysis. In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the court established a three part test for delineating between proper and improper government actions. According to this test a governmental action does not offend the Establishment Clause if it (1) has a secular purpose, (2) does not have the principal or primary effect of advancing or inhibiting religion, and (3) does not foster an excessive entanglement with religion. *Lemon,* 403 U.S. at 612–13. In a concurring opinion in the case of *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), Justice O'Connor sought to clarify the *Lemon* analysis by focusing on whether the government action endorsed religion. "Applying Justice O'Connor's refined analysis, the government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that religion or a particular religious belief is favored or preferred." *Bauchman v. West High School,* 132 F.3d 542, 551 (10th Cir.1997). Noting the current disarray surrounding the analysis of Establishment Clause challenges, the Tenth Circuit has adopted the approach that an action must satisfy both prongs of Justice O'Connor's "endorsement" and *Lemon's* excessive entanglement test in order to be proper. *Id.* at 552.

Balanced in the analysis of the permissibility or impermissibility of the Government's actions is the ability of government to accommodate religious practices. The Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Florida,* 480 U.S. 136, 144, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987). The Constitution actually "mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch v. Donnelly,* 465 U.S. 668, 673, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). The Defendants acknowledge that the voluntary climbing ban is intended to confer benefits on Native American worshipers, but they contend this is appropriate accommodation falling well within the confines of the Establishment Clause. "Rather than mechanically invalidating all governmental conduct or statutes that confer benefits or give special recognition to religion in general or to one faith ∴. the Court has scrutinized challenged legislation or official conduct to determine whether, in reality, it establishes a religion or religious faith, or tends to do so." *Id.* 465 U.S. at 678. This Court must look beyond the plain language establishing the climbing ban and examine its purpose and effects in order to determine if it is appropriate accommodation or if it breaches the necessary gap between state and religion fusing the two into one.

*Purpose*

The ability to accommodate religious practices is an important consideration in determining what constitutes a proper purpose under the *Lemon* test and Justice O'Connor's endorsement test. The Plaintiffs can succeed on this prong only if they show that the action has no clear secular purpose or that despite a secular purpose the actual purpose is to endorse religion. *Bauchman,* 132 F.3d at 554. The Supreme Court has noted that requiring a government action to serve a secular legislative purpose, "does not mean that the [policy's] purpose must be unrelated to religion." *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–day Saints v. Amos,* 483 U.S. 327, 335, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). In cases of accommodation the Court has stated that "it is a permissible ... purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Id.* 483 U.S. at 336.

In this case the Defendants contend that the climbing plan was designed, in part, to eliminate barriers to American Indian's free practice of religion. They argue that this type of accommodation is particularly appropriate in situations like this where impediments to worship arise because a group's sacred place of worship is found on property of the United States. Defendants assert that their actions are also aimed at fostering the preservation of the historical, social and cultural practices of Native Americans which are necessarily intertwined with their religious practices. While the purposes behind

the voluntary climbing ban are directly related to Native American religious practices, that is not the end of the analysis. The purposes underlying the ban are really to remove barriers to religious worship occasioned by public ownership of the Tower. This is in the nature of accommodation, not promotion, and consequently is a legitimate secular purpose.

*Effect*

■ Accommodation also plays a role in considering whether the principal effect of a policy is to advance religion. The Supreme Court has said; "[a] law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose. For a law to have forbidden 'effects' under *Lemon,* it must be fair to say that the government itself has advanced religion through its own activities or influence." *Id.* 483 U.S. at 337. "[O]n occasion some advancement of religion will result from governmental action." *Lynch,* 465 U.S. at 683. This is particularly true in cases of accommodation. Appropriate accommodation does not have a principal effect of advancing religion. Appropriate accommodation, however, is a matter of degree. *See Amos,* 483 U.S. at 334–35. Actions step beyond the bounds of reasonable accommodation when they force people to support a given religion.

The principle that the government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause. It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which "establishes a [state] religion or religious faith, or tends to do so."

*Lee v. Weisman,* 505 U.S. 577, 587, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992) (quoting *Lynch,* 465 U.S. at 678).

In the context of the Free Exercise Clause, the Tenth Circuit drew a line demarcating impermissible accommodation in the area of public lands ruling that the "[e]xercise of First Amendment freedoms may not be asserted to deprive the public of its normal use of an area." *Badoni v. Higginson,* 638 F.2d 172, 179 (1980). The record clearly reveals that climbing at the Devils Tower National Monument is a "legitimate recreational and historic" use of Park Service lands. (FCMP at 2; A.R. at 410–12). If the NPS is, in effect, depriving individuals of their legitimate use of the monument in order to enforce the tribes' rights to worship, it has stepped beyond permissible accommodation and into the realm of promoting religion. The gravamen of the issue then becomes whether climbers are allowed meaningful access to the monument. Stated another way, is the climbing ban voluntary or is it actually an improper exercise of government coercion? [6]

Plaintiffs argue that the "voluntary" ban is voluntary in name only. In support of their argument Plaintiffs note that the NPS has established a goal of having every climber personally choose not to climb at the Tower during June. (FCMP at 23). Plaintiffs also cite to possible modifications to the FCMP if the NPS deems the voluntary ban unsuccessful. Specifically, they draw the Court's attention to the fact that if the plan does not result in a significant reduction of climbers on Devils Tower each June, then the NPS may convert the closure to a mandatory closure.

Neither of these factors is sufficient to transform the voluntary ban into a coerced ban. The Park Service's stated goals are not the measure of coercion, rather the implementation of those goals is. The goal of reducing the number of climbers to zero may or may not be a desirable one [7], but coercion only manifests itself in the NPS's actions, not

---

**6.** Both Parties rely on the case of *Lyng v. Northwest Indian Cemetery Protective Assoc.,* 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988), in an effort to support their respective cases. The Court has concluded that the *Lyng* case is largely irrelevant to the issues at hand. That case addresses the other side of the issues presented here, namely what accommodation is constitutionally required when American Indians consid-

er public land sacred. Here, the Court must determine what type of accommodation is constitutionally permissible on lands considered sacred by American Indians.

**7.** In fact, a complete elimination of climbing from the Tower in the month of June would serve as powerful evidence of actual coercion.

in its aspirations. The Park Service's stated goals would not be advanced at all by mandating that climbers not scale the Tower. Instead, it has stated that the "voluntary closure will be fully successful when every climber *personally chooses* not to climb at Devils Tower during June." (FCMP at 23. See A.R. 67.) (emphasis added). Ordering climbers not to climb or deterring climbing through intimidation undermines this goal and robs individuals of the personal choice necessary to accomplish it. Yet, the Park Service's hopes that climbers will adhere to the voluntary climbing ban cannot be viewed as coercive.

The other purported indicia of coercion also fails to establish that the voluntary climbing ban is, in fact, mandatory. Although the NPS has stated that an unsuccessful voluntary ban may lead it to make the ban mandatory, that is far from an inevitable result. To the contrary, the conversion to a mandatory ban is only one of eight options which the NPS may consider in the event of a failed voluntary ban. While a more direct threat of a mandatory ban in the wake of a failed voluntary ban could evidence coercion, the remote and speculative possibility of a mandatory ban found in this case is insufficient to transform the Government's action into a coercive measure.

*Excessive Entanglement*

■ The Court concludes that the voluntary climbing ban also passes muster when measured against the excessive entanglement test. To determine whether a given policy constitutes an excessive entanglement the Court must look at "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." *Lemon,* 403 U.S. at 615. In making this analysis the Court must be mindful that "[e]ntanglement is a question of kind and degree." *Lynch,* 465 U.S. at 668. The organizations benefitted by the voluntary climbing ban, namely Native American tribes, are not solely religious organizations, but also represent a common heritage and culture. As a result, there is much less danger that the Government's actions will inordinately advance solely religious activities. The very limited nature of government involvement in this case

also tends to undermine any argument of excessive entanglement. The government is merely enabling Native Americans to worship in a more peaceful setting. In doing so, the Park Service has no involvement in the manner of worship that takes place, but only provides an atmosphere more conducive to worship. This type of custodial function does not implicate the dangerously close relationship between state and religion which offends the excessive entanglement prong of the *Lemon* test. *See Westside Community Bd. of Educ. v. Mergens,* 496 U.S. 226, 253, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990).

*The CMP and the Park Service's own policies*

Finally, Plaintiffs challenge the CMP as being contrary to the NPS's own policies. In support of their argument Plaintiffs cite to the NPS's *Native American Relationships Management Policy,* a policy which states that "religious activity at a particular place shall not form the basis for prohibiting others from using such areas." Defendants contend that the policy cited by the Plaintiffs has since been updated and replaced. The new Management Policy states that "[p]erformance of traditional activities at a particular place will not be a reason for prohibiting the use of that area by others except where temporary closings are authorized by law . . . ." (Management Policy 8:9, A.R. 2787). Regardless of which management policy the voluntary climbing ban is measured against, there is no apparent conflict. As outlined above, the policy adopted does not prohibit the use of the Monument. Were such a ban mandatory, either explicitly or implicitly, it would likely violate the guidelines outlined in the Management Policy. The current policy, however, does not.

CONCLUSION

The Plaintiffs have challenged four aspects of the NPS's Final Climbing Management Plan. Three of these four challenges are not susceptible to judicial review. The fourth, the voluntary climbing ban, is a policy that has been carefully crafted to balance the competing needs of individuals using Devil's Tower National Monument while, at the same time, obeying the edicts of the Consti-

tution. As such, the plan constitutes a legitimate exercise of the Secretary of the Interior's discretion in managing the Monument.

It is THEREFORE

ORDERED that the Secretary's decision to adopt the Final Climbing Management Plan is a lawful and legitimate exercise of his authority and is affirmed.