**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE ACCESS FUND,
       *Plaintiff-Appellant,*

      v.

UNITED STATES DEPARTMENT OF
AGRICULTURE; UNITED STATES
FOREST SERVICE; MIKE JOHANNS,*
       *Defendants-Appellees.*

No. 05-15585

D.C. No.
CV-03-00687-HDM

OPINION

Appeal from the United States District Court
for the District of Nevada
Howard D. McKibben, District Judge, Presiding

Argued and Submitted
February 15, 2007—San Francisco, California

Filed August 27, 2007

Before: J. Clifford Wallace, Richard D. Cudahy,** and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown;
Concurrence by Judge Wallace

---

  *Mike Johanns is substituted for his predecessor, Ann M. Veneman, as
Secretary of the Department of Agriculture, pursuant to Fed. R. App. P.
43(c)(2).

  **The Honorable Richard D. Cudahy, Senior United States Circuit
Judge for the Seventh Circuit, is sitting by designation.

10525

**COUNSEL**

Laurence K. Gustafson, Ashley B. Duffie, and Jeremy K. Kernodle, Haynes and Boone, L.L.P., Dallas, Texas, and Marte D. Lightstone, Miller Stratvert, P.A., Albuquerque, New Mexico, for the appellant.

Sharon Swingle, Michael Jay Singer, Appellate Staff, Civil Division; Peter D. Keisler, Assistant Attorney General; Daniel G. Bogden, United States Attorney; Department of Justice, Washington, DC, for the appellees.

**OPINION**

McKEOWN, Circuit Judge:

Cave Rock, a large rock formation on the eastern shore of Lake Tahoe, is many things to many people. To the Washoe Tribe, it is a site of powerful religious and cultural signifi-

cance. To historians and archaeologists, it sheds light both on historical Washoe culture and on the history of American transportation. And, to rock climbers, it offers some of the most challenging climbing in the nation. In this appeal, we consider the United States Forest Service's efforts to balance these competing historical, cultural, and recreational needs in developing a resource management plan for the area. After considerable study and comment, the Forest Service banned "the recreational activity of rock climbing" at Cave Rock. The Access Fund, a climbing advocacy group, challenged that decision as a violation of the Establishment Clause of the United States Constitution and as arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

## BACKGROUND

### I. FACTUAL BACKGROUND

Partially located within a National Forest, Cave Rock is a culturally, historically, and archaeologically significant site. Some of this significance derives from its role as a sacred site for the Washoe people, Native Americans who have lived in the Tahoe area for at least 1500 years. Traditional Washoe view Cave Rock as the site of important mythological events that are central to their cosmology. It is also a symbol of their cultural and religious identity.

Under traditional Washoe beliefs, Cave Rock is "the most religious feature within the Washoe religion," and many Washoe compare Cave Rock to a church. Cave Rock is considered so powerful and sacred that the health and integrity of Washoe society may be jeopardized if traditional practices are not observed there. The Washoe believe the rock is the location of an epic confrontation that occurred during the creation of the Tahoe landscape between water babies who figure prominently in Washoe mythology and a small weasel brother (a mythological ancestor of the Washoe).

Traditional Washoe assert that Cave Rock is to be avoided by all people, except Washoe practitioners who have been called to "seek power or knowledge at the rock." The presence of others at Cave Rock, including non-Washoe, is thought to endanger the lives of all. The cave, the top of the rock, and the water beneath the rock are particularly sacred.

The site is also historically and archaeologically significant. Two Washoe doctors named Welewkushkush and Big Mike were known to visit Cave Rock during the initial period after Euro-American settlement. Henry "Moses" Rupert, an ethnographer and the last known traditional Washoe practitioner at Cave Rock, also visited the site until his death in 1965. The rock is the only Washoe site that has been subject to archaeological and ethnographic study, and it contains ancient wooden rat middens that have paleo-environmental value.

The rock also reflects developments in the history of American transportation. It has served as an evolving travel corridor that moved aboriginal peoples, early immigrants, commercial freight, and tourists along the east shore of Lake Tahoe. The rock originally formed part of a trail used prior to Euro-American settlement; later on, settlers constructed a trestle road around the lake side of the rock. In 1931 and 1957, two tunnels were blasted through the rock to handle the increasing automobile traffic generated by Tahoe tourism, and as a result, Highway 50 now runs through the rock. The Forest Service has recognized that "Cave Rock presents a unique circumstance where four successive generations of road building are preserved in close proximity."

Since the late 1980s, Cave Rock has been a popular area for rock climbing. All of the rock climbing occurs on National Forest lands. With the advent of "sport climbing" methods, Cave Rock's overhanging walls have become a coveted challenge for many of the world's best climbers. Sport climbing is focused on shorter, very technical parts of the rock, and Cave Rock presents some of the most difficult routes in the

nation. Sport climbing requires the installation of fixed anchors, which protect against free-falling. To that end, climbers drilled permanent bolts into Cave Rock itself. Climbers expanded climbing routes without Forest Service approval both inside and outside the main cave area.

In the early 1990s, unknown individuals added a masonry floor and arranged rock seating in the cave without Forest Service approval and in violation of federal regulations prohibiting resource damage to the land. The government alleges that a group of climbers made these improvements, and the record suggests that the flooring was added because a climber fell and broke both of his legs.

The Washoe consider rock climbing a desecration of Cave Rock. Many Washoe view the placement of a single climbing bolt as a defacement, and Washoe representatives have repeatedly expressed concern that the intimate sustained contact with the rock that is inherent in climbing is more objectionable than the brief transitory effects of traffic passing through the tunnels that run through the rock.

## II.  REGULATORY FRAMEWORK AND AGENCY PROCEEDINGS

Because Cave Rock is located within a National Forest, the Forest Service is authorized to develop management plans to coordinate the multiple uses of the land and to prevent harm to natural and cultural resources. 16 U.S.C. § 1604(e)(1); 36 C.F.R. Part 219. In 1996, the Forest Service determined that Cave Rock was eligible for inclusion in the National Register of Historical Places as a traditional cultural property and archaeological site. During that time, Forest Supervisor Robert Harris determined that "technical rock climbing poses an adverse effect to the National Register eligibility of Cave Rock." The Nevada State Historic Preservation Office concurred with Harris's assessment. Although climbing may alter the rock physically, the drilling of the rock and placement of anchors has not weakened the structure geologically.

In 1998, the Keeper of the National Register confirmed that Cave Rock was eligible for inclusion on the National Historic Register as a traditional cultural property, an archaeological site, and an historic transportation corridor. The Keeper specifically recognized changes to the rock (including those changes wrought by climbing) affected its physical integrity, but nevertheless concluded the traditional cultural significance and the archaeological importance of the site survived.

Shortly after the Keeper made his decision, the Forest Service began developing a new management plan for Cave Rock. The Forest Service first implemented a series of orders that prevented the installation of new bolts. In January 1999, Juan Palma, a new Forest Supervisor for the area, solicited comments at the beginning of the formal planning process for Cave Rock required by the National Environmental Policy Act.

The Draft Environmental Impact Statement detailed five alternatives for managing Cave Rock, ranging from taking no action at all to banning all access to Cave Rock except by traditional Washoe practitioners. The alternative Palma initially preferred permitted public use, including rock climbing, with various restrictions on new routes and bolts.

After considering public comment, including comment from both the Washoe and members of the climbing community, the Forest Service issued a Final Environmental Impact Statement ("FEIS"). The Forest Service's proposal sought "to protect the Cave Rock heritage resource and regulate uses there in a manner that . . . preserves the historic and cultural characteristics that make the property eligible for listing on the National Register."

In formulating a management plan for the area, the Forest Service explained its priorities in resolving conflicts among competing uses. Preservation of significant cultural resources ranked third on the list of goals, subordinate only to protec-

tion of Lake Tahoe's water quality and protection of threatened and endangered species. A specific management practice addressed "Cultural Resources Management." Establishment of outdoor recreation facilities and uses fell much farther down the list of priorities.

The FEIS articulated a new preferred proposal intended "to protect Cave Rock's heritage resources": banning all climbing immediately; removing all climbing bolts as soon as technically feasible and legally authorized; and removing the masonry flooring inside the rock. This option would permit non-invasive recreation consistent with the historic period, such as hiking, picnicking, stargazing, boating, and fishing. This new alternative incorporated features from many of the previously considered proposals and did not introduce any new features.

The Forest Service considered the impact of each of the various alternatives on geology, heritage resources, land ownership, climbing, recreation, social practices, and wildlife. None of the options would have significant effects on geology, land ownership, or wildlife.

The Forest Service found that the presence of rock climbing hardware, the activities of traditional and free climbing, and the presence of non-historic graffiti and the masonry floor all represented adverse effects on the site's heritage resources. The agency also observed that "although objectionable to many Washoe, casual hiking, fishing, and sightseeing are consistent with the late historic period at Cave Rock associated with [Henry] Rupert, and therefore do not effect [sic] the setting and feel of the TCP [traditional cultural property] as an evolved property."

The FEIS also noted that Cave Rock is a "core element in the Washoe culture." In connection with a discussion of social practices and civil rights, the Forest Service emphasized that "[t]he fact that traditional history and culture at Cave Rock

are sometimes discussed in religious terms does not diminish the site's historical or cultural significance to the Washoe people." While recognizing climbers as an important social group that values the rock, the evaluation explained that the elimination of climbing should not be viewed as "requiring others to conform their conduct to Indian cultural concerns" — rather, the recommendation served the goal of protecting environmental, historical and cultural resources.

After issuing the FEIS, the Forest Service again sought public comment, and over 1400 individuals responded. Subsequent to considering these comments, the Forest Service formally adopted the preferred proposal at the final environmental impact stage. A third Forest Supervisor, Maribeth Gustafson, emphasized that "[a]lthough [the Cave Rock property] is spoken of in religious terms and is associated with spiritual figures, it has significant cultural and historical significance . . . . This significance is not based on 'Washoe religious doctrine' but rather on the secularly-derived historic and ethnographic record." She further explained, "I have chosen the historic period up to and including the life span of Henry Rupert (1885-1965), the historic Washoe shaman, as the time period for management of activities at Cave Rock. Improvement and activities that are consistent with this time period and do not adversely affect the integrity of Cave Rock will be allowed to continue." Following an administrative appeal challenging the prohibition on rock climbing at Cave Rock, the Forest Service's decision was affirmed.

## III.   PROCEEDINGS IN THE DISTRICT COURT

The Access Fund then brought an action in federal district court, naming the United States Department of Agriculture, the Forest Service, and Ann M. Veneman, who was then the Secretary of Agriculture, (collectively the "Forest Service") as defendants. The complaint asserted that the Forest Service's decision to ban rock climbing at Cave Rock (1) violated the Establishment Clause and (2) was arbitrary and capricious

under the APA. On cross-motions for summary judgment, the district court entered judgment in favor of the government. Citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the court held that Forest Service's actions did not violate the Establishment Clause. The district court also concluded that the Forest Service's decision to ban climbing was not arbitrary and capricious.

## STANDARD OF REVIEW

On cross-motions for summary judgment, we review the decision of the district court de novo, viewing the facts in the light most favorable to the plaintiff. *See Vernon v. City of Los Angeles*, 27 F.3d 1385, 1391 (9th Cir. 1994). We may set aside agency action under the APA only if it was "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

## ANALYSIS

### I. ESTABLISHMENT CLAUSE CHALLENGE

[1] The Access Fund's primary contention on appeal is that the Forest Service's decision to ban climbing at Cave Rock violated the Establishment Clause. The First Amendment of the Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., amend. I. The Supreme Court has counseled that "the Constitution [does not] require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984). That is, "the government may (and sometimes must) accommodate religious practices and . . . it may do so without violating the Establishment Clause. *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987).

The *Lemon* test remains the benchmark to gauge whether a particular government activity violates the Establishment

Clause. *Community House, Inc. v. City of Boise*, No. 05-36195, ___ F.3d ___, 2007 WL 1651315, at *10-*11 (9th Cir. June 8, 2007) (as amended). We recognize that the *Lemon* test has hardly been sanctified by the Supreme Court. *Id.* at *10 n.8; *see, e.g.*, *Van Orden v. Perry*, 545 U.S. 677, 685 (2005) (questioning the continued vitality of *Lemon* and declining to apply it); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 319 (2000) (Rehnquist, C.J., dissenting) ("*Lemon* has had a checkered career in the decisional law of this Court."). Nonetheless, the Court has invoked *Lemon* in recent opinions and surely has never expressly overruled or discarded the test. *See, e.g.*, *McCreary County v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 859-64 (2005) (reaffirming use of purpose prong of *Lemon*); *Zelman v. Simmons-Harris*, 536 U.S. 639, 668-69 (2002) (O'Connor, J., concurring) (reaffirming that the *Lemon* test is still the central tool of analysis in Establishment Clause cases). Accordingly, we apply *Lemon* here.

**[2]** Under *Lemon*, an action or policy violates the Establishment Clause if (1) it has no secular purpose; (2) its principal effect is to advance religion; or (3) it involves excessive entanglement with religion. 403 U.S. at 612-13. Some cases have also characterized the establishment inquiry as answering the question of whether the government, through its actions, impermissibly endorses religion. *Agostini v. Felton*, 521 U.S. 203, 235 (1997) (adopting endorsement formulation); *County of Allegheny v. Am. Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 592-93 (1989) (adopting endorsement and discussing it more generally).

In recent years, the Supreme Court often has discussed the last two *Lemon* criteria together, asking whether the challenged governmental practice has the effect of endorsing religion. Recent Ninth Circuit cases take different approaches to the continuing vitality of the entanglement prong of *Lemon*, but the Supreme Court has not discussed entanglement as distinct from effect in any meaningful way in the last ten years. *Compare Community House*, 2007 WL 1651315, at *11 ("In

*Agostini v. Felton*, 521 U.S. 203, 222-23 (1997), the Supreme Court refined the *Lemon* test by folding the 'excessive entanglement' inquiry into, and setting out revised criteria for, the 'effect' prong."), *with Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 976-77 (9th Cir. 2004) (discussing entanglement as a separate inquiry). Accordingly, we focus our discussion on purpose and effect, with an eye to potential effects that might result in government becoming impermissibly embroiled in religious affairs.

## A.  SECULAR PURPOSE

**[3]** The government easily satisfies the first prong of the *Lemon* test, which asks whether the challenged government action has a secular purpose or was taken for "the ostensible and predominant purpose of advancing religion." *McCreary County*, 545 U.S. at 860. Here, the Forest Service acted pursuant to a secular purpose — the preservation of a historic cultural area.

At every opportunity, the Forest Service reaffirmed its desire to protect Cave Rock as a cultural, historical, and archaeological monument. In 1996, more than ten years ago, the Forest Service determined that Cave Rock was eligible for inclusion in the National Register of Historical Places as a traditional cultural property. A traditional cultural property is "a discretely defined property that [has an] association with cultural practices or beliefs of a living community that: (1) [a]re rooted in that community's history; and (2) [a]re important in maintaining the continuing cultural identity of the community." 43 C.F.R. § 423.2. The Forest Service simultaneously observed that rock climbing adversely affects the National Register eligibility of the site because the climbing hardware undermines the physical integrity of the rock and the presence of climbers and their paraphernalia impairs the communication of the property's cultural significance.

The Forest Service's approach during its recent environmental review also reflected these secular motivations. The

Forest Service held community discussions with a wide variety of individuals and groups, including members of the climbing community and the Washoe Tribe. The public expressed significant interest, weighing in through more than 1400 letters, emails and phone calls during an informal comment period. In evaluating the competing proposals, the FEIS reviewed each proposal's impact on geology, heritage resources, land ownership, climbing, recreation, social practices, and wildlife in arriving at its final decision. While acknowledging that Cave Rock "may be discussed in religious terms and is associated with spiritual figures," the Forest Service emphasized that the rock "has significant cultural and historical significance that make it eligible to the National Register of Historic Places. Its significance is not based on 'Washoe religious doctrine' but rather on the secularly-derived historic and ethnographic record."

[4] The Forest Service's limitation on climbing served the permissible secular goal of protecting cultural, historical and archaeological features of Cave Rock. We discern no support for the claim that the Forest Service's decision was taken for the predominant purpose of advancing the Washoe religion. *McCreary County*, 544 U.S. at 860. And, we agree with the Forest Service that the fact that Cave Rock also derives its historical and cultural force in part from its role in Washoe religious belief and practice does not counsel the conclusion that the Forest Service acted with the purpose of advancing religion.

Historical and cultural considerations motivate the preservation of national monuments that may have religious significance to many or even most visitors. "Courts have long recognized the historical, social and cultural significance of religion in our lives and in the world, generally." *Bauchman v. W. High Sch.*, 132 F.3d 542, 554 (10th Cir. 1997). Indeed, such secular motivations lie behind the government's protection of many religious landmarks in this country, such as "the National Cathedral in Washington, D.C.; the Touro Syna-

gogue, America's oldest standing synagogue, dedicated in 1763; and numerous churches that played a pivotal role in the Civil Rights Movement, including the Sixteenth Street Baptist Church in Birmingham, Alabama." *See Cholla Ready Mix*, 382 F.3d at 976.

**[5]** To be sure, the record establishes the importance of Cave Rock to the Washoe Tribe. But even if the ban on climbing were enacted in part to mitigate interference with the Washoe's religious practices, this objective alone would not give rise to a finding of an impermissible religious motivation. The fact that Cave Rock is a sacred site to the Washoe does not diminish its importance as a national cultural resource.

This principle is best illustrated by our decision in *Cholla Ready Mix*. Arizona officials refused to give Cholla Ready Mix a permit allowing the company to sell materials mined at Woodruff Butte to state construction projects because the butte was an important cultural, historic, and religious site to several Native American groups. *Id.* at 972. Like Cave Rock, Woodruff Butte was also eligible for placement in the National Register. *See id.* In rejecting an Establishment Clause challenge, we held that the state had acted with a secular purpose even though it was partially motivated by the desire not to interfere with Native American religious practices. *See id.* at 975-76. The same analysis applies to Cave Rock.

**[6]** Nor is there any reason to think that the Forest Service's secular purpose was a sham or pretext. *Cf. McCreary County*, 545 U.S. at 864. The Forest Service's decision recounts the thorough documentation of "an extensive array of historic, cultural, archaeological and traditional values that are historic rather than religious by nature." Since 1996, the Forest Service has consistently embraced the view that Cave Rock is a historical and cultural landmark worth preserving, and that climbing threatens the cultural and physical integrity of the

site. Nothing in the record indicates impermissible religious motivation.

### B.   EFFECT OF ADVANCING OR ENDORSING RELIGION

The effect prong of *Lemon* "asks whether, irrespective of the government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring); *see also Vernon*, 27 F.3d at 1398. The test also considers whether non-adherents might view the challenged action as disapproval of their religious choices. *Cammack v. Waihee*, 932 F.2d 765, 777-78 (9th Cir. 1991). In addressing these issues, we often look to "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between government and religious authority." *Agostini*, 521 U.S. at 232 (quoting *Lemon*, 403 U.S. at 615) (discussing effect and entanglement together) (internal quotations omitted).

**[7]** As a practical matter, the climbing ban cannot be fairly perceived as an endorsement of Washoe religious practices. Indeed, during the public comment phase, the Washoe Tribe favored an alternative that would have precluded all activities inconsistent with traditional Washoe belief. This alternative would have denied non-Washoe access to the traditional cultural property and banned hiking and other recreational uses at the rock.

**[8]** The Forest Service's chosen alternative not only provides for general public use and access well beyond members of the Washoe Tribe, but also permits activities that are incompatible with Washoe beliefs. When a government action challenged under the Establishment Clause explicitly violates some of the core tenets of the religion it allegedly favors, such action will typically be considered permissible accommodation rather than impermissible endorsement. *Cf. Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1046 (9th Cir.

2007) (holding that where the government fell short of "absolutely vindicat[ing]" a religious group's interests, the government's action was a permissible accommodation).

The Forest Service's decision raises no specter that non-Washoe could credibly view the action as preferring the Washoe religion over other religious choices. The restriction on climbing does not reflect that the Forest Service "favor[s] tribal religion over other religions or that [the Forest Service] would not protect sites of historical, cultural, and religious importance to other groups" any more than Arizona's restriction on mining materials indicated favoritism in *Cholla Ready Mix*. *See* 382 F.3d at 976. Nor does anything in the record suggest that the Forest Service disapproves of non-Washoe religious practices, or that members of the Access Fund perceive the government's actions as "a disapproval of their religious choices." *Cammack*, 932 F.2d at 778 (internal quotations and citation omitted). Rather, the facts reflect only that the Access Fund's members, whatever their religious beliefs, would prefer to continue climbing on the rock, and the government's policy prevents them from doing so.

That a group of religious practitioners benefits in part from the government's policy does not establish endorsement. Significantly, the ban does not involve the Forest Service in any respect in Washoe religious practice. It does not require the Forest Service to monitor religious practice nor does it require the Forest Service to develop expertise on Washoe religious worship or evaluate the merits of different religious practices or beliefs.

The Access Fund argues that the ban will lead to the intertwining of government and religion because the Forest Service must adopt a "comprehensive, discriminating, and continuing" practice of surveillance to ensure that the climbing restrictions are obeyed. Regulatory or supervisory oversight of recreational activities, however, can hardly be cast as government endorsement or entanglement with religion. This

type of monitoring (for example, to ensure that visitors are picnicking and hiking rather than climbing) is no different than monitoring to ensure that visitors are not dumping trash at the site. Routine administrative or compliance activities do not constitute impermissible "interference of . . . secular authorities in religious affairs." *See Cammack*, 932 F.2d at 780; *see also Hernandez v. Comm'r*, 490 U.S. 680, 696-97 (1989) ("[R]outine regulatory interaction which involves no inquiries into religious doctrine . . . and no detailed monitoring and close administrative contact between secular and religious bodies, does not of itself violate the nonentanglement command.") (internal quotation marks and citations omitted).

Finally, we are not persuaded by the Access Fund's reliance on two out-of-circuit district court opinions: *Bear Lodge Multiple Use Association v. Babbitt*, 2 F. Supp. 2d 1448 (D. Wyo. 1998), *aff'd on other grounds by* 175 F.3d 814 (10th Cir. 1999) and *National Arch and Bridge Society v. Alston*, 209 F. Supp. 2d 1207 (D. Utah 2002). In *Bear Lodge*, the National Park Service asked individuals to refrain voluntarily from climbing during a month-long religious festival. 2 F. Supp. 2d at 1450. The court implied that a mandatory ban might violate the Establishment Clause. *Id.* at 1454-56. That case differs from this one in two significant respects — in *Bear Lodge*, the *only* reason for the closure was to facilitate current religious practice, and the Park Service specifically recognized that climbing was a "legitimate recreational and historic" use of the land. *Id.* at 1455. Here, the ban on climbing seeks to preserve the historic and cultural value of the site, and climbing has never been a legitimate historic use of the land. To the contrary, the Forest Service noted that the construction of the masonry floor and installation of climbing hardware were done without permission.

In *National Arch and Bridge*, the district court in Utah upheld a Park Service plan that asked visitors to the Rainbow Bridge National Monument to refrain voluntarily from walking under the bridge in deference to Native American reli-

gious beliefs. 209 F. Supp. 2d at 1224-25. The court concluded that the voluntary nature of the request was significant, and noted that a mandatory ban might be treated differently. *See id.* at 1223. But, as in *Bear Lodge*, the ban advanced solely sacred rather than secular goals.

**[9]** We conclude here, as we did in *Cholla Ready Mix*, that "the Establishment Clause does not bar the government from protecting an historically and culturally important site simply because the site's importance derives at least in part from its sacredness to certain groups." 382 F.3d at 977.

## II. APA CHALLENGE

**[10]** We are not persuaded by the Access Fund's claim that the Forest Service's decision to discriminate between climbers and other recreational groups was arbitrary and capricious in violation of the APA. *See* 5 U.S.C. § 706(2)(A). Before taking action, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

**[11]** The Access Fund argues that because there is no significant geological impact on Cave Rock from rock climbing, it is inconsistent to conclude that climbing harms the physical resource. The Access Fund's argument misses the point. The value of Cave Rock is not simply geological; it is also cultural and historical. As documented in extensive research and consultation with various community groups, rock climbing harms the physical (not necessarily geological) integrity of the rock. The Forest Service's decision to ban climbing, adopted after deliberate and thoughtful analysis and based on non-arbitrary historical considerations, does not violate the Administrative Procedure Act.

   **AFFIRMED.**

WALLACE, Circuit Judge, concurring:

I concur in the result, but write separately because I do not believe that the *Lemon* test should be applied in analyzing the claim under the Establishment Clause. As the majority points out, recent Supreme Court cases have questioned the continuing validity of the *Lemon* test. *See*, *e.g.*, *Van Orden v. Perry*, 545 U.S. 677, 685-86 (2005) (declining to apply the *Lemon* test); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 319 (2000) (Rehnquist, C.J., dissenting) ("*Lemon* has had a checkered career in the decisional law of this Court"); *Hunt v. McNair*, 413 U.S. 734, 741 (1973) (the *Lemon* factors serve as "no more than helpful signposts"); *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) (declining to apply the *Lemon* test). I do not believe that the *Lemon* test is helpful under the circumstances of this case, and would follow *Van Orden* instead.

In *Van Orden*, the Supreme Court addressed whether the placement of a Ten Commandments monument on the Texas State Capitol grounds violated the Establishment Clause. 545 U.S. at 681. The plurality opinion recognized "two faces" that must be considered. *Id.* at 683-85. "One face looks toward the strong role played by religion and religious traditions throughout our Nation's history[,]" while the other "looks toward the principle that governmental intervention in religious matters can itself endanger religious freedom." *Id.* at 683. The plurality opinion further expressed the view that the Establishment Clause does not "bar[ ] any and all governmental preference for religion over irreligion." *Id.* at 684 n.3. Instead, determining whether the monument violated the Establishment Clause required an inquiry into both "the nature of the monument and [ ] our Nation's history." *Id.* at 686.

A majority in *Van Orden* recognized that the Ten Commandments were religious, but found that no Establishment Clause violation occurred. *Id.* at 690-91; *id.* at 700, 704 (Breyer, J., concurring). The plurality opinion observed that

while the Ten Commandments had religious significance, they also had an undeniable historical meaning. *Id.* at 690. The monument had a "dual significance, partaking of both religion and government." *Id.* at 692. Further, the placement of the monument on state capitol grounds was a more passive use than the posting of the texts in public classrooms, a practice that the Supreme Court had previously held to have violated the First Amendment in *Stone v. Graham*, 449 U.S. 39 (1980). *Id*. at 691-92.

*Van Orden* is distinct from this case in that it involved a placement of a monument with religious text. Here, the government did not erect any monument or structure. Instead, Access Fund contends that the government's *ban* on rock climbing violates the Establishment Clause. Despite this difference, I believe that the plurality's analysis in *Van Orden* is helpful in determining whether an Establishment Clause violation occurred.

As discussed in the majority opinion, Cave Rock is a culturally, historically, and archaeologically significant site. It is a core element of the Washoe people's culture and a sacred site in the Washoe religion. It is important to the Washoe people's religious identity, and figures prominently in their religious beliefs. Cave Rock has secular significance as well. It has been the subject of archaeological and ethnographic studies, and has historical significance as a travel corridor.

Access Fund argues that the climbing ban promotes the Washoe religion. Even assuming that this is true, however, merely "promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." *Id.* at 690. Like the monument in *Van Orden*, the climbing ban has "dual significance": although it may promote the Washoe religion, it also protects a culturally, historically, and archaeologically significant site. There is "no constitutional requirement which makes it necessary for government to be hostile to religion and throw its weight against efforts to widen the effec-

tive scope of religious influence." *Id.* at 684 (citation and quotations omitted). Under the circumstances, I would hold that the climbing ban does not violate the Establishment Clause of the First Amendment to the Constitution.